N8MDLeeH

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ERIKA LEE,

4                   Plaintiff,

5            v.                          22 CV 08618

6   DELTA AIR LINES, INC.,

7                   Defendant.
                                         Hearing
8   ------------------------------x
                                         New York, N.Y.
9                                        August 22, 2023
                                         9:30 a.m.
10
    Before:
11
                  HON. ROBERT W. LEHRBURGER,
12
                                         U.S. Magistrate Judge
13

14                       APPEARANCES

15  MORGAN LEWIS & BOCKIUS, LLP
         Attorney for Defendant
16  BY:  JONATHAN WEINBERG
         IRA ROSENSTEIN
17

18  Also Present:  Erika Lee, Pro Se

19

20

21

22

23

24

25
```

N8MDLeeH

1          THE DEPUTY CLERK:  Good morning, parties.  We're here

2     for evidentiary hearing in 21 CV 8618, *Erika Lee v. Delta Air*

3     *Lines, Inc.*

4          Parties, please state your name for the record.

5          MS. LEE:  Erika Lee, pro se.  Erika Lee, pro se.

6          THE COURT:  Good morning.

7          MR. ROSENSTEIN:  Ira Rosenstein, Morgan Lewis &

8     Bockius, for the defense.

9          THE COURT:  All right.  Good morning, all.

10          So we are here for an evidentiary hearing in light of

11     the request from Delta raising concerns about the bona fides of

12     the plaintiff and other person who may be involved, as well as

13     the truth and veracity regarding address and assorted other

14     things.

15          So I will allow counsel for Delta to examine the

16     witness on the issues that he intends to, and I will also allow

17     the plaintiff, if she wants to make a statement separately

18     after that, to do so.

19          But, Mr. Rosenstein, is there anything you want to say

20     before we start on the questioning?

21          MR. ROSENSTEIN:  No, your Honor.  Thank you for the

22     opportunity.

23          Just logistically, I do have some documents that I

24     would like to show Ms. Lee, and I wonder whether it's

25     acceptable for her to stay at the counsel table for that or

N8MDLeeH

1  whether you intend to call her to the witness stand.

2          THE COURT:  Well, if you're going to be asking

3  questions of her, I'm going to ask her at the witness stand

4  under oath.

5          MR. ROSENSTEIN:  Okay.

6          THE COURT:  In which case, you can use the documents

7  as exhibits.  Are these documents that have been on file?

8          I want to know if Ms. Lee has received those documents

9  in some shape or form in the past.

10          MR. ROSENSTEIN:  Yes.  These are all documents that

11  are in the docket, and they are largely documents that Ms. Lee

12  filed in this case.

13          THE COURT:  Okay.  Ms. Lee, do you have any questions

14  before me start?

15          MS. LEE:  No, your Honor, but I would like to make a

16  statement after I'm sworn in.

17          THE COURT:  Go ahead.

18          MS. LEE:  After I'm sworn in.

19          THE COURT:  After you're sworn in?

20          MS. LEE:  Yes.

21          THE COURT:  All right.  Why don't you come up and take

22  the witness stand.

23          MS. LEE:  Can I bring my papers?

24          THE COURT:  Yes.

25          MS. LEE:  Okay.

NM8DLeeH                    Lee

1          THE COURT:  Why don't you get yourself settled.

2          MS. LEE:  Okay.

3          THE COURT:  Do you want some water?

4          MS. LEE:  I could take some.  Thank you so much for

5     asking.

6          THE COURT:  All right.  So I'm going to swear in

7     Ms. Lee, and she said she does have a statement she wishes to

8     make, so I will allow her to make that statement.

9          I think it would be best to do it in that order, and

10    then you will have heard what she has to say and examine

11    accordingly.

12         So, Ms. Lee, please raise your right hand.

13         (Witness sworn)

14         MS. LEE:  Yes, your Honor.

15         THE COURT:  All right.  Thank you.

16         Please put down your hand, and why don't you proceed

17    with your statement.

18     ERIKA LEE,

19        Plaintiff pro se, called as a witness by herself

20    ,

21        having been duly sworn, testified as follows:

22

23    DIRECT EXAMINATION

24    BY THE WITNESS:

25         MS. LEE:  Okay.  First, I am the plaintiff here, your

NM8DLeeH                         Lee

1    Honor.

2              THE COURT:  Okay.  Slow down, a little more slowly, so

3    that the court reporter can get it all down.  You are closer

4    now, so hopefully it will be louder.

5              MS. LEE:  Okay.  First, I am the plaintiff here, and I

6    and only I have written every paper and brief filed in this

7    case and written all discovery documents served on Delta.

8    Aasir's only involvement in this case is that Aasir is a

9    witness per the complaint, and that Aasir served Jose Rosado

10   and David Needham on August 8th since Ira doesn't believe

11   Cheline Byrd is a real person, and I know Ira is not --

12             THE COURT:  When you are saying "Ira," are you

13   referring to Mr. Rosenstein?

14             THE WITNESS:  Yes, your Honor.  Mr. Rosenstein.

15             Okay.  Since Mr. Rosenstein doesn't believe Cheline

16   Byrd is a real person, and I know Mr. Rosenstein cannot deny

17   that Aasir is a real person.  And while I have no testimony to

18   offer to corroborate Mr. Rosenstein's 100 percent false

19   criminal accusations, which are based on speculation, however,

20   because Delta and/or Delta attorneys are and have been making

21   criminal accusations against me and have previously requested

22   referrals for criminal prosecution regarding these same issues

23   Delta's attorneys requested this hearing for, I am invoking my

24   Fifth Amendment privilege as to any questions related to and

25   involving Aasir Azzarmi, and/or these false criminal

NM8DLeeH                        Lee

1    accusations that somebody is ghost writing for me.

2              Also, Aasir is suing Mr. Rosenstein for a 1983 civil

3    rights violation, and it's improper for Mr. Rosenstein to use

4    my case as a venue or for obtaining discovery involving Aasir.

5    Mr. Rosenstein's conspired to get Aasir falsely arrested, and

6    Delta's attorneys requested that Rosanda Brown and Aasir

7    Azzarmi be referred for criminal prosecution based on these

8    same allegations that they are now manufacturing against me.

9              So I have a reasonable belief that Delta's motives for

10   these evidentiary hearings are solely for criminal prosecution.

11   This is their standard MO, and -- as this is what they do to

12   employees who have merited cases.  But while I am invoking the

13   Fifth Amendment privilege on these false criminal accusations

14   that Delta's attorneys are making against me, I am here to

15   testify about my merits of my case.  And I brought evidence of

16   my similarly situated, non-black comparators, who were treated

17   differently by Delta than I was.

18             So Mr. Rosenstein is welcome to question me about my

19   knowledge of my own case and the facts that I wrote in the

20   second amended verified complaint, because Mr. Rosenstein's

21   false accusations of my Fifth Amendment rights to

22   Mr. Rosenstein's manufactured criminal accusations does not

23   preclude me from testifying about the fact related to my case

24   and my second amended verified complaint.

25             THE COURT:  All right.  Thank you.

NM8DLeeH                          Lee - Cross

1               THE WITNESS:  Thank you, your Honor.

2               THE COURT:  Thank you.

3               Just so you understand, we're not addressing the

4      merits today.

5               THE WITNESS:  Okay.

6               THE COURT:  But I understand what you have said.  I

7      will allow Mr. Rosenstein to addresses anything he wants to

8      that he's heard or proceed directly into examination.  If you

9      have a view on the defendant -- I'm sorry, the plaintiff's

10     assertion of Fifth Amendment privilege in this context, I

11     welcome that as well.

12              MR. ROSENSTEIN:  I'll proceed --

13              THE COURT:  Okay.

14              MR. ROSENSTEIN:  -- and see how it plays out.

15              THE COURT:  Okay.

16     CROSS-EXAMINATION

17     BY MR. ROSENSTEIN:

18     Q.  Good morning, Ms. Lee.

19     A.  Good morning.

20     Q.  Did you write the speech that you just read to the Court

21     yourself?

22     A.  Yes.

23     Q.  Okay.  And tell me, what's your understanding of the Fifth

24     Amendment?  What is that?

25     A.  The Fifth Amendment is a right to not incriminate myself,

1    which means that when I testify against -- when I testify to

2    something, it needs to be -- it may incriminate me, so I'm

3    going to testify to the merits of my case, that I wrote my case

4    and that -- just a minute.  And that I don't want you to try to

5    railroad me into a criminal action at some point by discussing

6    other facts of someone else's case or them into another case as

7    well, so I will be pleading the Fifth, also maintaining -- not

8    saying anything in regard to that.

9    Q.  What's your understanding of the meaning of the term

10   "incriminate" in a legal proceeding?

11   A.  Incriminate, just so you can get trumped up charges against

12   me, it's not knowing that might incriminate me per se of me

13   actually doing something illegal, but you can also just imply

14   whatever you want.  You turned a lot of things around already,

15   and I can prove that.

16          THE COURT:  Let's not worry about having the witness

17   interpret legal terms or constitutional terms.  If there is

18   propriety in invoking the Fifth, she will do so.  If not --

19          MR. ROSENSTEIN:  My purpose is not to -- is not to

20   test her legal knowledge, but to follow up on the question of

21   who wrote the presentation.

22          THE COURT:  So let's do that.

23   Q.  I'm going to show you a document that you've submitted in

24   this case and that you refer to in your presentation, and this

25   is a document that is --

NM8DLeeH                        Lee - Cross

1    A.  Thank you.

2    Q.  -- docket 58.  Can you -- there's an email and then there's

3    a document underneath it.

4            Can you identify the attached document -- not the

5    email, but the attached document?

6    A.  Yes.

7    Q.  You said no?

8    A.  I said yes.  I have it.

9    Q.  Can you identify what it is?

10   A.  Yes.  It's my second amended verified complaint.

11   Q.  And it's your sworn testimony here that you drafted this

12   complaint yourself, correct?

13   A.  Yes.

14   Q.  What caused you to submit a second amended verified

15   complaint in this case?

16   A.  I took out -- I added David and Jose -- David Needham, Jose

17   Rosado, and I also added 1981, and whistleblowers, and deleted

18   the breach of contract.

19   Q.  Okay.  Why did you make those changes?

20   A.  I made the changes because you stated that the -- there was

21   a timeframe for one that was over the intentional infliction of

22   emotional distress.  I had a statute of limitations of one

23   year, and the negligent infliction of emotional distress is

24   three years statute of limitations.

25   Q.  I'm going to show you a -- just for the record, what role,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NM8DLeeH                          Lee – Cross

1    if any, did Mr. Azzarmi play in drafting the amended complaint?

2            THE COURT:  The amended or the second amended?

3            MR. ROSENSTEIN:  The second amended.  Thank you, your

4    Honor.

5    A.  I will be invoking my Fifth Amendment objection.

6    Objection, Fifth Amendment.

7    Q.  What is the basis of your objection?

8    A.  Well, the basis of my objection -- because I already told

9    you that I won't be speaking about Aasir Azzarmi.  I'll be

10   talking about the case, so you won't try to serve criminal

11   prosecution against me, because my case has merit, to try to

12   railroad me into something, because, you know, I'm defending

13   myself.  But also we can use objection, and asked, answered,

14   because I did give you information in my statement beforehand.

15   Q.  Okay.  I'm going to show you a document that was also filed

16   in this case.

17   A.  Thank you.

18   Q.  This is at Docket No. 27.

19           Are you familiar with this document?

20   A.  Yes.  It's rather old, though.

21   Q.  Did you write this document?

22   A.  I wrote all documents for my case.  Objection, asked,

23   answered.

24           THE COURT:  What is the document?

25           MR. ROSENSTEIN:  Docket 27.  It's the response to

NM8DLeeH                     Lee - Cross

1    defendant's motion to dismiss, request for notice of conversion

2    to Rule 56 motion.

3    Q.   You cite a lot of cases in this document, would you agree

4    with me?

5    A.   Give me a moment to look.  It's been some time, and I've

6    been looking on a lot of case -- on the case in California as

7    well.

8    Q.   Do you recall?  The question is just, you cite a lot of

9    cases in this document?

10           Take your time if you need it.

11   A.   Yeah.  I am reading it.  I'm reading it over again.  You

12   know, that's -- you know, well, and I'm -- okay.  So for

13   evidence, yes, I cite a lot.  I cite cases.

14   Q.   Okay.  And how do you go about researching to find those

15   cases?  What's your methodology?

16   A.   Well, I've used Google, and I just go in and look at

17   defendant Delta and/or whatever may be -- Delta Air Lines, and

18   then, after that, I can look at the case, certain cases or

19   anything in regard to say like the law, I'll go in and Google

20   the law and search all the cases, or not all the cases, but

21   cases that will come up on Google.  And then I will look and

22   see like what happened during that case and see if it pertains

23   to what I'm suing Delta for.

24           And then sometimes you have to purchase the case,

25   because they'll only give you a little bit of information, and

NM8DLeeH                          Lee - Cross

1    then I might go through Pacer.

2    Q.  Okay.  Do you have any other sources of research available

3    to you other than Google?

4    A.  Yes.

5    Q.  What else?

6    A.  Nolo Law, I go on there.

7    Q.  I'm sorry?

8    A.  Nolo Law.

9    Q.  Nolo Law?

10   A.  Yes.

11   Q.  Anything else?

12   A.  There's plenty of books I've looked to pertaining to my

13   case.  There's YouTube.  They tell you beginning and end how to

14   start, begin a case, how to start it.  Even TikToks, as well as

15   every social media has information on how to get started and

16   what company -- the whole process you need to do, how to win a

17   case with a 30(b)(6).

18   Q.  This document that you wrote and filed, what was it about?

19   What was it -- what was the subject area that you were arguing?

20          Do you know, without looking at it, before you look at

21   it?

22   A.  This is from January, sir.

23   Q.  Right, but it is this year, so I'm just wondering what you

24   know about this document, without reading it.

25   A.  No.  I do know about it.

NM8DLeeH                       Lee - Cross

1    Q.  So tell me about it.

2    A.  But I can't give you an argument about it right now.

3              THE COURT:  So he's not asking you to have an

4    argument.

5              THE WITNESS:  Yes.

6              THE COURT:  He's just asking you what you know about

7    it without reading it, and you only know what you know.  Then

8    maybe he'll go through it, but he's just asking you what you

9    know about it right now, without reading it.  It's okay not to

10   remember things.

11             THE WITNESS:  Yeah, I would need to read over it.

12   Q.  Right.  Well, if you read the front of it, it says,

13   Response to Defendant's Motion to Dismiss, Request for Notice

14   of Conversion to Rule 56 Motion.

15             What's your understanding of -- does that help refresh

16   your recollection as to why you submitted this?

17   A.  No.  That's why I'm telling you, I need to read it, read it

18   over.

19   Q.  That's fine.

20   A.  Objection, asked, answered.

21   Q.  I heard your answer.

22             What is a Rule 56 motion?

23   A.  I didn't read it.

24   Q.  No.

25             THE COURT:  He's asking you right now, without reading

NM8DLeeH                          Lee - Cross

1   it.

2   Q.  What is a Rule 56 motion?

3   A.  I need to read it.

4   Q.  Okay.  That's fine.

5       What is res judicata?  Do you know what that is?

6   A.  Yes.  Yes.

7   Q.  What is that?

8   A.  When I sued Delta, this is my -- you know, my

9   interpretation.

10  Q.  Sure.

11  A.  When I sued Delta for -- in the court, in Federal Court in

12  California, I sued them for the merits of my case.  The judge,

13  that judge, dismissed my case, not for the merits but for

14  jurisdiction per se.  So my case has not been completely

15  dismissed, because it still has merit.  But it's more like it

16  was in the wrong location when I, you know, got situated with

17  that.

18      So right now, you know, that's what that's for.  So

19  it's not for my merits.  It's just more for the jurisdiction.

20  Q.  Are you familiar with a United States Supreme Court case

21  called *Semtek International v. Lockheed Martin*?

22  A.  I use that as a reference, yes.

23  Q.  And what is Rule 41(b), without looking?

24  A.  I have to look at that.

25  Q.  You don't know that?

NM8DLeeH                        Lee - Cross

1   A.  I don't know that offhand.

2   Q.  That's fine.

3   A.  I don't know anything offhand except what I'm doing today,

4   because I --

5   Q.  You said you used the *Semtek* case.  What way did you use

6   it?

7   A.  As a reference.  I referenced it.

8   Q.  You referenced it and for why?  Why did you choose that

9   case?  Without looking.  I'm asking for your memory.

10  A.  No.  I need to look at it.

11  Q.  That's fine.  If you can't answer my question -- as the

12  judge told you, if you can't answer a question without looking

13  at the document, then you should just tell me you can't answer

14  it.  But I still don't want you looking at the document.

15  A.  Why did you give it to me again?

16          THE COURT:  Sorry.  No.  So, look, he's going to be

17  asking you questions, and, again, if you don't know without

18  looking at it, you can say "I don't know without looking at

19  it."  That's fine.  If he wants you to look at it at a later

20  time, he will --

21  A.  Okay.  I don't know without looking at it.

22  Q.  Okay.  Thank you.

23          If you look at the document now, in Exhibit One that

24  you have -- I guess it's the second exhibit, sort of towards

25  the middle there's a declaration.  It's page 11 of 35 on the

NM8DLeeH                    Lee - Cross

1  top, and it's a declaration of Erika L. Lee.

2  A.  Yes.

3  Q.  Okay.  You signed that document, on the page that's listed

4  as 13?

5  A.  Yes.

6  Q.  That's your signature?  It looks different than other

7  signatures I've seen of yours, and that's why I'm asking you.

8  A.  Yes.  I used a CamScanner, so that is with my finger.

9  Q.  And why did you use a CamScanner to sign?

10          If you wrote it, why didn't you just sign it while you

11  had it right --

12  A.  Well, you know, when you -- you put the document on pdf,

13  and then I put it -- upload it on CamScanner, and then I used

14  the CamScanner signature, where you use your finger.

15  Q.  I'm just wondering if you wrote this document.  You had it

16  on your laptop, correct?

17  A.  I had -- yes.

18  Q.  And so why use CamScanner to sign it if it was on your

19  laptop?  Why not just sign it like you have all the other

20  documents that you've submitted in this case?

21  A.  Well, that -- I'm sorry.  Because if it's on my computer,

22  how do you sign your computer?  You put it on -- you upload it

23  onto the CamScanner, and then they give you the option to put

24  your initials or your whole signature.  I chose to use my

25  initials.

NM8DLeeH                        Lee - Cross

1    Q.   Okay.  And this is a document that we've established in

2    prior hearings before this Court that has an incorrect address

3    of where you live on the first page, correct?

4    A.   Yeah.

5    Q.   It says 100 Confucius Plaza, not 20 Confucius Plaza,

6    correct?

7    A.   Yeah.  That was an error.

8    Q.   Your testimony under oath now is that you wrote your own

9    address incorrectly on that?  That's a typo?  Correct?

10   A.   That was a typo.

11   Q.   Okay.  And it's your testimony that Mr. Azzarmi did not

12   write this document and have you sign it via CamScanner,

13   correct?

14   A.   I wrote my own documents.

15   Q.   Mr. Azzarmi did not write this document and have you sign

16   it by CamScanner; is that your testimony?

17   A.   Asked -- objection, asked, answered.

18        I wrote my own documents.

19   Q.   I'm asking you about this specific document.

20        THE COURT:  He's asking you a more specific question.

21   A.   This is my work.

22   Q.   I didn't ask you that.  I asked whether you wrote this

23   document and signed it with an incorrect address and the

24   CamScanner signature or whether Mr. Azzarmi wrote it and had

25   you sign it.

NM8DLeeH                          Lee - Cross

1    A.  The address was an answer -- I used the CamScanner and

2    initialed my document after I uploaded it with the CamScanner,

3    and I can only admit -- I can only do what I can do.  And I --

4    this is --

5    Q.  I'm asking whether Mr. Azzarmi wrote this document and

6    asked you to sign it.  Yes or no?

7    A.  He did not.

8    Q.  Okay.  And just to be clear, it's your testimony that the

9    cases that are cited in here were all located using Google,

10   correct?

11   A.  Google, Pacer.

12   Q.  Attached to the back of Exhibit One appears to be an

13   exhibit that you have in front of you, which I guess is Exhibit

14   Two, a document that was filed in the United States District

15   Court for the Central District of California.

16            Do you see that?

17   A.  Exhibit -- which one?

18   Q.  I think it's page 14 of 35.

19            Do you see that?

20   A.  Okay.

21   Q.  Okay.  This document reflects that case that you had in

22   California prior to the case that is here in New York, correct?

23   A.  Yes.  March 1st, 2022 --

24   Q.  Did Mr. -

25   A.  -- this was filed.

NM8DLeeH                        Lee - Cross

1    Q.  Did Mr. Azzarmi assist you in any of the filings or legal

2    work that you did in the California case referred to in the

3    document that I just showed you?

4    A.  No.

5    Q.  Did you have any -- prior to bringing the cases against

6    Delta, did you have any background in legal proceedings?  Had

7    you ever worked in a law office or as a paralegal?

8    A.  No.

9    Q.  Do you have any legal training of any kind?

10   A.  No.

11   Q.  And remind me what your last level of education was?

12   A.  I have a Bachelor's in Science of Business, with a

13   concentration in marketing.  I also have a nursing degree.

14   Q.  Okay.  You said that you wrote the documents that were

15   filed here on a laptop, correct?

16   A.  Yeah.  Laptop, iPad, phone, they're all pdf.

17   Q.  But the briefs and pleadings that are lengthy, you didn't

18   write those on your phone, correct?

19   A.  No.

20   Q.  Okay.  Would that have been written on a laptop?

21   A.  Yes.

22   Q.  Okay.  And was it the same laptop that you've had this year

23   and since January of 2023, or do you have a different one?

24   A.  Well, I have more than one.

25   Q.  How many laptops do you have?

NM8DLeeH                        Lee - Cross

1   A.  I have two.

2   Q.  Okay.  And do you write your papers in this case on both of

3   the laptops, or do you use only one for that purpose?

4   A.  I use both.

5   Q.  You use both.

6          And do you still have those, both laptops?

7   A.  I do.

8   Q.  And have you deleted any of the documents that you wrote on

9   those laptops from your hard drive on those laptops?

10  A.  Yes.

11  Q.  You have?

12  A.  Yes.

13  Q.  Oh, okay.  All of the documents have been deleted from your

14  laptop?

15  A.  No, they have not.

16  Q.  Which ones have been deleted?

17  A.  It's not more or less deleted.  More or less transferred to

18  an external drive.

19  Q.  Okay.  And do you still have the external drive?

20  A.  Yes.

21  Q.  Okay.  And is the laptop where you wrote the papers in this

22  case something that you have access to right now?

23  A.  No, I do not have access to it right now.

24  Q.  Now, in this courtroom, but in your -- one of your

25  residences?  Do you have access to it at a residence or a place

1   where you reside?

2   A.  Yes.

3   Q.  You do.  Okay.  And where -- which residence are the

4   laptops residing right now?

5   A.  My New York City residence.

6   Q.  Is that 20 Confucius Plaza?

7   A.  Yes.

8   Q.  Okay.  And where is the hard drive that you described that

9   you have transferred some documents to?

10  A.  20 Confucius Plaza.

11  Q.  Same place?

12  A.  Yes.

13  Q.  What's the brand of the hard drive?

14  A.  Western Digital maybe?  I'm not sure.

15  Q.  Okay.  And does anybody else have access to your laptops or

16  the hard drive besides yourself?

17  A.  Anyone who comes to my home to -- who asks to use my

18  laptop, yes.

19  Q.  Okay.  But, in general, do you loan out your laptop to

20  other people?

21  A.  No.

22  Q.  Does it leave your home on a regular basis or --

23  A.  No.  It leaves my home with me.

24  Q.  It leaves your home.  Have you ever given your laptop to

25  Mr. Azzarmi?

NM8DLeeH                          Lee - Cross

1    A.  I have not.

2    Q.  Okay.  Have you ever given access to your hard drive to

3    Mr. Azzarmi?

4    A.  No, I have not.

5    Q.  Have you ever given access to your email address to

6    Mr. Azzarmi?

7    A.  No, I have not.

8    Q.  Okay.  You said that you have used something called

9    CamScanner.

10            Am I remembering that right?

11   A.  Yes.

12   Q.  What is CamScanner?

13   A.  It is a pdf file maker.  So you take a picture of a

14   document, and it turns it into a pdf.

15   Q.  Is it a physical thing or is it an application program?

16   A.  It's an application.

17   Q.  Okay.  And where -- you downloaded CamScanner onto your

18   laptop?

19   A.  No.  You download it to your phone and you transfer

20   objects.  When you make the pdf, you make the pdf and you send

21   them to your email or to your wherever.

22   Q.  Well, do you need to use your phone to take a physical

23   picture of a document?

24   A.  You can use anything that takes pictures to use it, or you

25   can use a printer or scanner as well.

NM8DLeeH                        Lee - Cross

1   Q.  Okay.

2   A.  And it can read it through the CamScanner application.

3   Q.  Where does the program reside in your possession?  Is it on

4   your phone?  Is it --

5   A.  From my phone.  It's an application you can put on your

6   phone.  It's on my phone.

7   Q.  In your case, it's on your phone?

8   A.  Yes.  And when you take the picture of the printed

9   document, such as this, you then forward it to your computer or

10  laptop.

11  Q.  Is a record sent when you use CamScanner on your phone?

12  A.  A record?

13  Q.  Like a receipt or an acknowledgment that it was sent?

14  A.  No, it's not.

15  Q.  You don't receive an email that says "your scan went

16  through" or something of that nature?

17  A.  No.  It's not a fax machine.

18  Q.  I didn't ask whether it was a fax machine.  Just a yes or

19  no will do.

20  A.  No.

21  Q.  And did you keep any record personally of the times that

22  you used CamScanner yourself?

23  A.  Yes.

24  Q.  Where does that reside?

25  A.  It's on my laptop and my phone.

NM8DLeeH                        Lee - Cross

1    Q.  On your laptop and your phone?

2    A.  Yeah.

3    Q.  Can I ask, why do you have two laptops?  Is there one for

4    one purpose and one for another purpose?

5    A.  One is older and one is newer.

6    Q.  Yeah.  Do you recall which laptop you used to write the

7    second amended complaint?

8    A.  No.  Maybe the newer one, but I --

9    Q.  I don't want you to guess.  If you remember, tell me.  If

10   you don't, just tell me you don't and that's fine.

11   A.  I don't remember.

12   Q.  Okay.  Now, going back to the second amended complaint, you

13   testified that you had added two individuals, Jose Rosado and

14   David Needham, to the second amended complaint, correct?

15   A.  Yes.

16   Q.  And you testified that it was your decision to do that,

17   correct?

18   A.  Yes.

19   Q.  Okay.  And you understood you needed to serve them with a

20   copy of the complaint, correct?

21   A.  Yes.

22   Q.  Okay.  What's your understanding of how you serve somebody?

23   How do you go about serving an individual?

24   A.  There are two ways to serve.  Well, I -- we send it through

25   the mail.  I've done that before for you.  And you send it

NM8DLeeH                      Lee - Cross

1    personally to that individual, like to a job, or their last

2    known address, or the address that you see for them.

3    Q.  Okay.  And what did you do to determine where to serve Mr.

4    Rosado and Mr. Needham?

5    A.  LinkedIn.

6    Q.  Okay.  And walk us through how you implemented a service of

7    process of Mr. Needham and Mr. Rosado.  You can do it one at a

8    time.

9    A.  Okay.  So I prepared the second amended complaint, put it

10   in an envelope, gave it to Aasir, and he -- she took it to

11   their location of work and presented it to -- for David,

12   Aretha, it is a lady.  I have video documentation of this.  And

13   for -- no, that was for David.  Yeah.  David was Aretha.  The

14   lady came out of her office and buzzed her in -- him -- her in,

15   and took the file in, in an envelope.

16          And for Dave, went in his office -- there was like I

17   guess a security guard or a person that sits at the front desk.

18   Took the object, and said that -- oh, David Needham, that's our

19   HR rep.  So they confirmed that he was the HR rep. there.  And

20   I also have video confirmation of those both of these.  If you

21   want to show me how to send it, I can send it.

22   Q.  How do you know all of what happened?  You weren't present,

23   were you?

24   A.  I have the video.

25   Q.  Who took the video?

NM8DLeeH                        Lee - Cross

1   A.  Aasir.

2   Q.  Who is Aasir?

3   A.  Oh, that's what I call Mr. Azzarmi.

4   Q.  Okay.

5   A.  Sorry.

6   Q.  When did this take place to your knowledge?

7   A.  Oh, yeah.  It was -- hold on.  I know the date.

8   Q.  What are you looking at?

9   A.  I was looking to see when -- I believe it was the -- it was

10  this month.

11  Q.  The month of August?

12  A.  Yes.

13  Q.  And did you ask Mr. Azzarmi to serve Mr. Needham and Mr.

14  Rosado?

15  A.  Yeah.  I wanted them re-served.

16  Q.  Why did you ask Mr. Azzarmi to do that?

17  A.  He had a -- he had an opportunity -- she had an

18  opportunity.

19  Q.  Can you expand on what that means, "she had an

20  opportunity?"

21  A.  Availability.  And I didn't want there to be any

22  information -- any, as you said -- you said that Cheline Byrd

23  is not a real person, doesn't have an internet presence, and I

24  know you have a history with Azzarmi.

25  Q.  That's why you chose Mr. Azzarmi to serve the papers on

NM8DLeeH                        Lee - Cross

1    Mr. Needham and Mr. Rosado?

2    A.  And as well as availability.

3    Q.  Okay.  Did Mr. Azzarmi volunteer to do it or did you seek

4    him out?

5    A.  I asked.

6    Q.  And does Mr. Azzarmi live with you on 20 Confucius Plaza?

7    A.  No, they do not live there with me.  They do come and

8    visit.

9    Q.  Do you know where -- let me back up for a second.

10   A.  Yes.

11   Q.  You've been using different pronouns for --

12   A.  Yes.

13   Q.  -- the person we call Azzarmi.  I understand just generally

14   that that person may prefer to be described using the "she"

15   pronoun.  Is that your understanding as well?

16   A.  That is correct.  That is correct.

17   Q.  So I apologize in advance if I did not use that pronounce,

18   but I'm just trying to use the name "Azzarmi" without pronouns

19   if I can, so without being rude or coming across as rude.

20          So when you talked to Azzarmi, you said that Azzarmi

21   comes and goes.  Do you know where he resides -- do you know

22   where Azzarmi resides presently?

23   A.  As far as I know, California.

24   Q.  You talked about somebody named Cheline Byrd, correct?

25   A.  Yes.

NM8DLeeH                          Lee - Cross

1    Q.  Cheline Byrd is somebody that you knew earlier in your

2    life?  It is a real person, correct?

3    A.  Yes.

4    Q.  Okay.  And Cheline Byrd is somebody that you knew for

5    several years, correct?

6    A.  Yes.

7    Q.  Okay.  And she lives -- where does she live?

8    A.  She was living at 1 East 35th Street.

9    Q.  And isn't it true that you used to live at 1 East 35th

10   Street?

11   A.  It is true.

12   Q.  Did you live with her there?

13   A.  No.

14   Q.  And how is it that she's living in a place you used to

15   live?  Is there a coincidence or is there a story about that?

16   A.  There is a story behind it, but she needed to stay there at

17   the time.

18   Q.  Do you own that apartment?

19   A.  No, I do not.

20   Q.  Do you have the ability to sublease it to another

21   individual?

22   A.  No, I do not.

23   Q.  Do you have any kind of work relationship with Cheline

24   Byrd?

25   A.  No, no work relationship.

NM8DLeeH                         Lee – Cross

1    Q.  Where does Cheline Byrd work, if you know?

2    A.  She does not work.

3    Q.  How old is Cheline Byrd?

4    A.  I believe she is 41.

5    Q.  How long have you known Cheline Byrd?

6    A.  Over 20 years.

7    Q.  Can you describe her?

8    A.  She is a black female, a little darker skinned than me, and

9    about my height, thinner than me –– about the same size as me.

10   Q.  Does she have any legal training to your knowledge?

11   A.  To my knowledge, she does not.

12   Q.  And did you ask her to serve documents for you?

13   A.  Yes, I did.

14   Q.  Why did you choose to do that?

15   A.  At that moment, she was available.

16   Q.  And did she report to you whether she had served documents?

17   A.  Yes, she did.

18   Q.  What did she tell you?

19   A.  She said she served the documents.

20   Q.  Did she tell you how she served them?

21   A.  Yes.

22   Q.  What did she tell you?

23   A.  She told me that she had mailed out the two items that I

24   prepared.  And then she said that she went to Farmingdale, New

25   York, to present one, and that would be I believe David

NM8DLeeH                          Lee - Cross

1    Needham's, and went to the airport to serve the other, which

2    was Jose Rosado.

3    Q.  Did she tell you that she had personally served Mr. Needham

4    in Farmingdale, New York, on July 14, 2023?

5    A.  Yes, she did.

6    Q.  And did she tell you how she personally served him?

7    A.  Yes.  I believe she said that she knocked on the door and

8    she left it with a woman there, but --

9    Q.  So she did not personally serve Mr. Needham; is that right?

10   A.  Not personally to him, but personal to his address at that

11   time.

12   Q.  Okay.  So when the -- if you take a look at -- I'm going to

13   show you another document that's marked as -- we can mark as

14   the third exhibit.

15           MR. ROSENSTEIN:  If I could give the witness another

16   document?

17           THE COURT:  Sure.  You can hand it to my deputy.

18   Q.  So you're familiar with these documents, these proofs of

19   service, correct?

20   A.  Yes.

21   Q.  And you filed them with the court, correct?

22   A.  Yes.

23   Q.  And you knew that when you filed the proof of service on

24   Mr. Needham that it was inaccurate, correct?

25   A.  It is not incorrect, because there's still a personal

NM8DLeeH                          Lee - Cross

1    service even if she didn't put it in his direct hand.

2    Q.  That's your view of the law?

3              I just want to make sure I understand why you're

4    saying that.

5              Is that correct, that's your understanding?

6    A.  That is my -- not necessarily my understanding, but he did

7    receive it, because he reported it back to you.

8    Q.  Okay.

9    A.  Okay.

10   Q.  It says, "I personally served the summons on the

11   individual," and the individual, you'd agree with me, is David

12   Needham, correct?

13   A.  Yes.

14   Q.  So wouldn't you agree with me that that is an inaccurate

15   document?

16   A.  Okay.

17   Q.  Okay.

18             THE COURT:  Mr. Rosenstein, which document is that?

19   First of all, who is that signed by, that one?

20             MR. ROSENSTEIN:  That is signed by Cheline Byrd.

21             THE COURT:  Is there a way to identify it as a

22   document in the docket?

23             MR. ROSENSTEIN:  Yes.  It is Docket Entry 63.

24             THE COURT:  Okay.

25             MR. ROSENSTEIN:  Page two.

NM8DLeeH                         Lee - Cross

1  Q.  I'm going to show you another document, which will be the

2  fourth --

3          THE COURT:  Fourth?

4  Q.  Fourth exhibit.

5  A.  Thank you.

6  Q.  And this is a document in the docket as docket 64, and it's

7  a letter from me to the Court with attachments.

8          Do you recall receiving this letter, and the

9  attachments?

10 A.  I'm sorry.  I'm looking at a *Rosanda Brown v. Delta Air*

11 *Lines* --

12 Q.  Just look at the first page of the email, of the document,

13 where it's a letter dated July 26 to Judge Lehrburger.

14          Do you see that?

15 A.  Yes.

16 Q.  Okay.  And so my question is, do you recall receiving that

17 letter with the attachments?  And, again, if you do, you do.

18 If you don't, you don't.

19 A.  No.

20 Q.  You don't recall that?

21 A.  Huh-uh.  I don't receive -- I did not receive this in the

22 mail.

23 Q.  Okay.

24 A.  Oh, I'm sorry.  I did.  I have it here.  Yeah.  Go ahead.

25 I'm sorry.  I had to read it.

NM8DLeeH                        Lee - Cross

1    Q.  When you say you have it here, does that mean you have a

2    copy of it in your physical possession?

3    A.  Not -- yes, over there I believe.

4    Q.  Okay.  You're saying, just to be clear on the record, you

5    brought a copy of that record to court with you today?

6    A.  Of the letter?

7    Q.  Of this letter that I just gave to you, correct?

8    A.  Hold up.  Let me read it.

9    Q.  Sure.

10          MR. ROSENSTEIN:  Could I trouble you for a glass of

11   water?

12          THE WITNESS:  Yes.  You sent me this.

13          MR. ROSENSTEIN:  Okay.  I'm just going to take a

14   second, because I just need a -- thank you so much.

15   Q.  Okay.  And did you read it once you received it?

16   A.  Yes, I did.

17   Q.  Okay.  And the letter you agree refers to your location on

18   July 20 and July 19, correct?

19   A.  Correct.

20   Q.  Okay.  Where were you on July 19?

21   A.  I was here in New York.

22   Q.  Okay.  And where were you on July 20?

23   A.  I was here in New York.

24   Q.  Have you been to the State of California in any -- in the

25   last two or three months?

NM8DLeeH                          Lee - Cross

1    A.  Yes, I have.

2    Q.  When were you in California?

3    A.  I don't recall at the moment, but I have been in the State

4    of California in the month July, but early, earlier.

5    Q.  Okay.  If you look at the Exhibit A to the letter, which is

6    the first page of the exhibit --

7    A.  Yes.

8    Q.  Do you see it?  There's an email from the

9    Leeerikalatise@gmail.com to Andrew Frederick.

10          Do you see that?

11   A.  Yes.

12   Q.  And is it your testimony that you wrote this email to

13   Mr. Frederick on July 19 at 9:09 a.m.?

14   A.  Yes.

15   Q.  Okay.

16   A.  Not 9:09 a.m.  No -- you're right, 9:09 a.m.

17   Q.  Okay.  And is it your testimony that you filed an

18   opposition to Delta's motion to clarify the Court's order in

19   California on July 20?

20   A.  Yes, sir.

21   Q.  And is it your testimony that you drafted that motion for

22   clarification to the California court?

23   A.  No.

24   Q.  Did Mr. Azzarmi draft that document?

25   A.  No.

NM8DLeeH                          Lee - Cross

1    Q.  Did he help you in drafting that document?

2    A.  No.

3    Q.  Did you draft that on your laptop?

4    A.  Yes.

5    Q.  Okay.  And did you -- how did you file it in California if

6    you were in New York?  What did you do?

7    A.  I did not file it in California.  I was here in New York.

8    I typed over an old form, and that was a form error when it

9    stated at the bottom for California.  That was a form error.

10   Q.  So the document says that it was filed in California, but

11   your testimony here under oath is that that was just a mistake,

12   correct?

13   A.  It was a --

14   Q.  So how did you file it from New York in California?

15   A.  I was -- I uploaded it, to the email.

16   Q.  In what system did you upload it into a California court?

17   There was no ability to do that to my knowledge.  How did you

18   do that?

19   A.  What are you asking me?

20   Q.  Well, how did you file it in California if you were in New

21   York?  That's what I'm asking.

22           It was filed on that date?

23   A.  What are you asking me did I file?  Show me.

24           THE COURT:  Let's clarify which document you're

25   referring to.

NM8DLeeH                        Lee - Cross

1           THE WITNESS:  Yes.

2    Q.  Take a look at another document that I will give to you and

3    we can clear this up I think.  This is the sixth exhibit.

4    A.  Thank you.

5    Q.  Do you recognize this document, Ms. Lee?

6    A.  Yes, I do.

7    Q.  Okay.  And the document that is there is filed in this

8    court on Thursday, July 20, 5:15 p.m., correct?

9    A.  Hold on.  Okay.  Yes.

10   Q.  And that's Docket No. 60, correct?

11   A.  Yes.

12   Q.  Okay.

13           THE COURT:  What is the document called?

14   Q.  And that's plaintiff's response in opposition objection to

15   defendant's letter motion for leave to file a motion to stay in

16   ECF 59?

17   A.  Yes.

18   Q.  Correct?

19   A.  Uh-huh.

20   Q.  Do I have that right?

21   A.  You are correct.

22   Q.  And attached to that document on page one of 20, Exhibit A,

23   is another document that was filed by you on the same day,

24   July 20th, in California.

25   A.  Yes.

NM8DLeeH                          Lee - Cross

1    Q.  And that's Response to Defendant's Harassing Redundant

2    Frivolous Notice of Motion and Motion to Correct Clarification,

3    and that was filed in California, correct?

4    A.  What page are you on?  You said A?  One of 20, Exhibit A?

5    Q.  It's sort of ten, 12 pages in.

6    A.  Yes.

7    Q.  Do you see that?  It's under Exhibit A?

8    A.  Yes.

9    Q.  And that document has an address for you at 1054 East

10   Turmont Street, Carson, California, correct?

11   A.  Yes.

12   Q.  It doesn't use your 20 Confucius Plaza address, correct?

13   A.  It does not use my California address.

14   Q.  And in it you declare that everything in that document is

15   true and correct?

16   A.  Yes, I do.

17   Q.  Is that right?

18          Okay.  And my question, before I hand you this

19   document, was how did you file this document from New York?

20   What methodology?

21   A.  Oh, you mean -- okay.  So for this court, you have to go

22   onto their website to file it.  Whereas this one, you have to

23   do it through an email.

24          THE COURT:  Wait.  So the first court in your sentence

25   you're referring to is California?

NM8DLeeH                          Lee - Cross

 1                    THE WITNESS:  California.

 2                    THE COURT:  The second one is New York?

 3                    THE WITNESS:  New York, yes.

 4    Q.  And it's your testimony here under oath that you filed this

 5    document and served it from the State of New York?

 6    A.  Yes.

 7    Q.  And it's your testimony that Mr. Azzarmi did not have

 8    anything to do with filing this?

 9    A.  No.

10    Q.  And it's your testimony that you wrote this document as

11    well, Exhibit A, in its entirety, correct?

12    A.  Yes.

13    Q.  Okay.  And you did all the research for it as well,

14    correct?

15    A.  Yes.

16    Q.  Is that right?

17    A.  Yes.

18    Q.  And all the citations are cases that you located on Google;

19    is that correct?

20    A.  And Pacer.

21    Q.  And Pacer.  Got it.  Got it.

22                    And in this -- you were able to draft both this

23    document and the Needham response in opposition to defendant's

24    letter motion to file more or less on the same day, correct?

25    A.  Correct.

NM8DLeeH                          Lee - Cross

1    Q.  It took you a day to put both of these papers together; is

2    that your testimony?

3    A.  Yes.

4    Q.  It's impressive.  What is the document that's called

5    Plaintiff's Response in Opposition Objection to Defendant's

6    Letter Motion for Leave to File a Motion to Stay?

7    A.  Which one?

8    Q.  The first one.  Without reopening it -- I'm not asking you

9    to read it.  It was only a few weeks ago, so I'm sure you

10   remember why you wrote it.  So what was it?  Why were you doing

11   that?

12   A.  Oh --

13   Q.  Well, I'm not asking you to look at it.  I'm just asking --

14   A.  Okay.  Well, the reason --

15   Q.  Yes.  I mean, why did you do it?

16   A.  I did it because -- because you wanted to stay and I

17   didn't.  You wanted to stop the proceedings, the discovery.

18   Q.  Yes.  And what was your basis for believing that a stay was

19   not warranted?  Why did you think that it was inappropriate?

20   A.  Because you're here to delay, delay -- your whole thing is

21   about Mr. Azzarmi.  Nothing about me and my merits.

22   Q.  What was the legal basis for your motion, without reading

23   it?  I'd like you to tell us what the legal basis for it was

24   without reading it.

25            It looks like you're reading it.

NM8DLeeH                          Lee - Cross

1  A.  I need to read it.

2  Q.  You don't remember?  It was only three weeks ago.

3  A.  Do you know how many I've written in this time period?

4  Q.  In the last three weeks you've written a lot of motions.

5  A.  Yeah, because I'm reading everything.  I'm preparing it.

6  Because you're reading everything as well.

7  Q.  That's fine.

8          THE COURT:  Let's remember here that the witness is a

9  lay witness.

10         THE WITNESS:  Exactly, your Honor.

11  Q.  And what was the basis for the filing you made in

12  California?  Why did you file it?

13  A.  Because Andrew --

14         THE WITNESS:  I don't have his last name, your Honor.

15         THE COURT:  Okay.

16  A.  That lawyer, he's trying to open up a closed case that he

17  asked to be closed, to be dismissed, and he wants to reopen it.

18  You know, I'm getting hit all over the place, and I just want

19  my rights to be, you know, honored.

20  Q.  And what was the legal basis that you relied on in filing

21  that motion?

22  A.  Filing that motion?  Because the judge -- the judge, her

23  honor, should not be able to open that case back up and deny it

24  off of the merits when we haven't even discussed the merits for

25  that case.  He didn't ask for it to be dismissed based on the

NM8DLeeH                           Lee - Cross

1    merits.  He asked for it to be dismissed based on a rule.  And
2    at the moment, I don't know the rule, but he asked for it on
3    the rule, not the merits of my case.
4    Q.  Did you tell Mr. Frederick and the Court that you wanted to
5    delay any kind of hearing on that motion, because you were
6    having surgery on August 23rd?
7    A.  Yes.
8    Q.  But are you having surgery on August 23?
9    A.  It's been delayed.
10   Q.  Okay.  Do you know what sua sponte means?
11   A.  Sua sponte?  Is that the indefinite stay?
12   Q.  Either you know it or you don't know it, but that's fine.
13          Do you know what boiler plate means?
14   A.  Boiler plate?  I've seen it used, and that's why I've used
15   it.
16   Q.  And how do you use it?  What's your understanding of what
17   it means?
18   A.  The boiler plate?  Let me read it.
19   Q.  No, I'm not asking you --
20   A.  No.  I need to read it.
21   Q.  -- in context.
22   A.  Yes.
23   Q.  But off the top of your head, you don't know what it means
24   sitting here now?
25   A.  No.

NM8DLeeH                        Lee - Cross

1    Q.  Okay.  I'm going to show you a document that can also be an

2    exhibit.

3              THE COURT:  Exhibit No. 7?

4              MR. ROSENSTEIN:  Yes.

5              THE WITNESS:  Thank you.  Okay.

6    Q.  Are you familiar with this document?

7    A.  Uh-huh.

8    Q.  Yes?

9    A.  Yes.  I'm sorry.

10   Q.  That's okay.  And did you write this yourself?

11   A.  Yes.

12   Q.  Why?

13   A.  This is a discovery tool, so I could get the information

14   from you so we can know what we're doing.  It saves time for

15   the actual case.  And I want -- you want me to tell you what --

16   like the questions I asked, which would be what, the

17   interrogatories?

18   Q.  No.  I just asked if you knew what the document was.

19   A.  Yeah, I do.

20             THE COURT:  Mr. Rosenstein, what docket number?

21             MR. ROSENSTEIN:  Sorry.  This is -- these are the

22   discovery requests that were filed in the case, so they are not

23   in the docket, but they are in the docket as exhibits to this

24   motion for stay of discovery.  So that would be --

25             THE COURT:  What's the title of the document?

NM8DLeeH                           Lee - Cross

1           MR. ROSENSTEIN:  Plaintiff's Rule 33 Interrogatories

2     and Rule 34 Request for Production of Documents.

3           THE COURT:  Thank you.

4           MR. ROSENSTEIN:  Thank you.

5     Q.  I'm going to send you another document.

6           THE COURT:  Exhibit Eight?

7           THE WITNESS:  Thank you.

8     Q.  Are you familiar with this document?

9     A.  Yes.

10    Q.  Okay.  Did you write it?

11    A.  Yes.

12    Q.  Did Mr. Azzarmi have anything to do with writing this?

13    A.  No.

14          THE COURT:  Are you going to identify the document,

15    please?

16          MR. ROSENSTEIN:  This is an email.  I apologize, your

17    Honor.

18    Q.  This is an email from Erika Lee to me dated July 18, 2023,

19    with an attachment, Plaintiff's Notice of Rule 30(b)(6)

20    Deposition.

21          What is a 30(b)(6) deposition?

22    A.  It's another discovery tool, so that Delta can send in a

23    person to represent Delta and I can ask them questions about --

24    well, I'll give you a list of topics -- they can be able to

25    answer all the topics I've given them in the Rule 30(b)(6).

NM8DLeeH                          Lee - Cross

1    Q.  Did you pay a deposit to a court reporter?

2    A.  I was in the process of it.

3    Q.  Well, I didn't ask that.

4    A.  No, not as of yet.

5    Q.  Okay.  Thank you.

6    A.  You got your stay.

7    Q.  I'm going to show you another document.  It would be

8    Exhibit Nine, and this is Docket No. 65.

9            Are you familiar with this document?

10   A.  Yes.

11   Q.  Did you draft this?

12   A.  Yes.

13   Q.  Sorry.  I couldn't hear you.

14   A.  Yes.

15   Q.  You drafted this on your laptop?

16   A.  Yes.

17   Q.  And it's still on your laptop?

18   A.  I believe so.

19           THE COURT:  Can you identify the document, please?

20           MR. ROSENSTEIN:  I had -- it says Document 65 -- oh,

21   you want the name of it.  Plaintiff's Response in Opposition

22   and Objection to Defendant's Harassing Letter Regarding Alleged

23   Litigation Conduct in ECF No. 64.  Plaintiff Moves for

24   Protective Order under Rule 26.

25           THE COURT:  Thank you.

NM8DLeeH                         Lee - Cross

1   Q.  And it's your testimony that you did the research for this

2   filing as well, correct?

3   A.  Yes.

4   Q.  And that you found all the cases on Google, correct?

5   A.  Yes, I did.

6   Q.  Okay.

7   A.  You'd be surprised.

8   Q.  How long did it take you to write this document?

9   A.  A little while.

10  Q.  How long is a little while?

11  A.  Over a day.

12  Q.  And what do you base your New York constitutional claims

13  on?

14  A.  In this document?

15  Q.  In general.

16  A.  My constitutional claims?  As in amendments?  Well, I would

17  like --

18  Q.  I mean, you --

19  A.  Ask me something specific, please.

20          THE COURT:  Yes.  I agree.  And you're testing her on

21  legal knowledge.  I recognize that these are legal documents

22  and there's claims of legal research, et cetera, but it would

23  not be unreasonable for a lay person to not necessarily recall

24  everything about what they research and have written.

25          So far the witness has reasonably acquitted herself of

NM8DLeeH                        Lee - Cross

1   at least providing knowledge of a good many of the documents

2   that you've been presenting her with.  It's obviously not

3   perfect and certainly not going to be what you or I would

4   necessarily remember, but I'm not sure that you're really

5   making the headway you would hope to make on this particular

6   line of questioning.

7   Q.  Can you take a look -- you testified earlier that you

8   learned that Delta was contesting service on Mr. Rosado and

9   Mr. Needham, correct?

10  A.  You mean when you said that?  I mean --

11  Q.  Yeah.

12  A.  Okay.

13  Q.  Well, did you -- it's your testimony.  Did you --

14  A.  Well, yeah, you contested it.

15  Q.  Did you learn --

16  A.  You contested --

17          THE COURT:  One at a time.

18          THE WITNESS:  Okay.

19          THE COURT:  Ask your question, because I'm not clear

20  what the question is.

21  Q.  Did you learn on July 26 that Delta was contesting service

22  on Mr. Rosado and Mr. Needham from Cheline Byrd, that Delta was

23  saying that this service was not effective?

24  A.  Yes.

25  Q.  You learned that from the letter that Delta submitted to

NM8DLeeH                        Lee - Cross

1  the Court, correct?

2  A.  Yes.  When you stated she was not a real person.

3            THE WITNESS:  Your Honor, I do have evidence.  I can

4  --

5            THE COURT:  Just hold onto it for a moment.

6            THE WITNESS:  Okay.

7  Q.  Did you engage Mr. Azzarmi at that point to try to reserve

8  him?  I think you said you did, right?

9  A.  I did ask him -- sorry, her.  I've known her for a long

10  time before, and the -- I did ask her to redo it so we would

11  not have no issues moving forward.

12  Q.  Do you know somebody named Dena Stinnet?

13  A.  I don't.  I don't believe so.  I do know of a Vena Stinnet.

14  Q.  Did you have any involvement in a lawsuit that Vena Stinnet

15  brought against Delta Air Lines?

16  A.  Involvement as to what?

17  Q.  Did you participate in any way in that lawsuit?

18  A.  Possibly.

19  Q.  Did you have access to her complaint and her filings in

20  that case?

21  A.  I do not.

22  Q.  Did you at any time?

23  A.  No.

24  Q.  Did you ever serve papers for Ms. Stinnet?

25  A.  Possibly.  I need to look at what you're showing me.  I

NM8DLeeH                          Lee - Cross

1  mean, you're asking me these questions and I don't know

2  anything -- you know, can you show me something?  I will give

3  you --

4  Q.  I'm just asking you --

5          THE COURT:  This is more of a factual nature.

6          THE WITNESS:  Oh, okay.  Okay.

7  Q.  Do you remember serving Vena Stinnet with any papers?

8  A.  Serving her?

9  Q.  Or serving anybody papers in Vena Stinnet's case?

10 A.  I might have.

11 Q.  And why would you have done that?

12 A.  To serve documents.  I mean, I don't understand why I would

13 --

14 Q.  Who asked you to serve papers for Vena Stinnet if that even

15 happened?

16 A.  That's what I'm saying, I don't recall.  But that's what

17 I'm saying, if you can show me something and I look at it and I

18 see the name, I will definitely say yes or no I did or did not

19 do that.

20 Q.  That's become clear.

21 A.  Yes.

22 Q.  I'm not asking you as to that?

23 A.  Okay.

24         THE COURT:  Do you need more water?

25         THE WITNESS:  I do.  I started drinking more water

NM8DLeeH                          Lee - Cross

1   lately.  Thank you, your Honor.

2              MR. ROSENSTEIN:  If we could just take a minute break

3   so I can recap --

4              THE COURT:  Sure.  Why don't we take a ten-minute

5   break.

6              MR. ROSENSTEIN:  Okay.

7              THE COURT:  Mr. Rosenstein, how much more do you have?

8              MR. ROSENSTEIN:  I think that might be it.

9              THE COURT:  So you can step down, and we can take a

10  ten-minute break.

11             (Recess taken.)

12             THE COURT:  Ms. Lee, come back to the stand.

13             Ms. Lee, you are still under oath.

14             Do you understand?

15             THE WITNESS:  Yes.

16             MR. ROSENSTEIN:  I don't have any further questions.

17             THE COURT:  I have a few questions.  So, first of all,

18  are you familiar with Westlaw or Lexis?

19             THE WITNESS:  Well, yeah, I used -- I look at them on

20  the internet.

21             THE COURT:  So you have used those?

22             THE WITNESS:  More like Cornell Law.

23             THE COURT:  Have you used the Westlaw service?

24             THE WITNESS:  I might have.  I've used a lot of the --

25             THE COURT:  You've used the Lexis service?

NM8DLeeH                         Lee - Cross

1              THE WITNESS:  I may have.

2              THE COURT:  Okay.  And it's been said a couple times

3     today that you live at 20 Confucius Plaza, correct?

4              THE WITNESS:  Yes.

5              THE COURT:  What apartment there do you live at?

6              THE WITNESS:  10-K

7              THE COURT:  So has Mr. Azzarmi ever lived with you at

8     that apartment?

9              THE WITNESS:  Completely lived, no.  Has stayed the

10    night, yes.

11             THE COURT:  What's the longest period he's stayed

12    there?

13             THE WITNESS:  Two to three nights.

14             THE COURT:  Okay.  And where does he reside?

15             THE WITNESS:  California.

16             THE COURT:  So there was reference before to the

17    service that Mr. Azzarmi made in order to serve Mr. Rosado and

18    Mr. Needham.

19             Do you remember that?

20             THE WITNESS:  Yes, your Honor.

21             THE COURT:  Okay.  Are those proofs of service before

22    the witness, Mr. Rosenstein?

23             MR. ROSENSTEIN:  They are not, but they can be.

24             THE COURT:  I'd like that, please.

25             So this will be Exhibit Ten.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NM8DLeeH                            Lee - Cross

1                 THE WITNESS:  Thank you.

2                 THE COURT:  Do you recognize those documents, Ms. Lee?

3                 THE WITNESS:  Yes.

4                 THE COURT:  Do you understand each of the proofs of

5    service that were filed by you but under the signature of

6    Mr. Azzarmi saying that he made the service on Mr. Rosado and

7    Mr. Needham?

8                 THE WITNESS:  Yes.

9                 THE COURT:  Okay.  Do you see at the bottom that

10   Mr. Azzarmi says that his address is 20 Confucius Plaza, 10-K?

11           Do you see that?

12                THE WITNESS:  Yes.

13                THE COURT:  Do you know why he listed his address as

14   your address?

15                THE WITNESS:  He uses my address for New York.

16                THE COURT:  Okay.  Has he used that address on other

17   pleadings that he's filed in other cases?

18                THE WITNESS:  Yes.

19                THE COURT:  All right.  Mr. Rosenstein, anything you

20   want to follow up?

21                MR. ROSENSTEIN:  No, your Honor.

22                THE COURT:  All right.  Ms. Lee, thank you.

23           Is there anything else you wanted to say while you're

24   still up there?

25                THE WITNESS:  Well, I do have evidence that shows that

NM8DLeeH                          Lee - Cross

1    they're lying about Cheline not having an internet presence.

2    This is the -- they talked about the screenshot with the Apple

3    product.

4                THE COURT:  Are you referring to Ms. Byrd?

5                THE WITNESS:  Ms. Byrd, Cheline Byrd, yes.  She has an

6    internet presence.

7                THE COURT:  Okay.  So what's the evidence that you

8    want to --

9                THE WITNESS:  This is a screenshot of a Google.com

10   search engine stating she is a person and she does have an

11   internet presence.

12               THE COURT:  All right.  We'll mark this as Exhibit 11.

13               THE WITNESS:  And this is a --

14               THE COURT:  Why don't you show this to Mr. Rosenstein.

15               THE WITNESS:  Yes.

16          And it took 26 seconds to bring that up.  And this is

17   an article I would like to present in evidence by Mike Peterson

18   from AppleToolbox.com.  And it shows that there is a time zone

19   bug, because he's stating something about a screenshot and it

20   would be too many different places.  It was -- and then on the

21   ninth --

22               THE COURT:  Hold on.  So I am marking as Exhibit 12 a

23   printout from -- is this a printout from the internet?

24               THE WITNESS:  Yes.

25               THE COURT:  Okay.  And the title is "There's a Time

NM8DLeeH                          Lee - Cross

1   Zone Bug in IOS, in --

2              THE WITNESS:  Yes.

3              THE COURT: -- iPad IOS.  Here's what to do it about

4   it."  Last updated May 1st, 2020.

5              THE WITNESS:  And on July 19, I would like to present

6   a Google -- sorry, an Uber receipt, which I received from Uber,

7   for July 19.  And it shows that there is a time zone issue,

8   because they sent me the receipt three hours before I took the

9   trip, and I want to present that.

10             THE COURT:  All right.  So this is Exhibit 13.  It's

11  from Uber receipts, and the subject is your Wednesday morning

12  trip with Uber dated July -- and the date of the email is

13  July 19, 2023, at 9:18:45 a.m.  It's to ErikaLee@Hotmail.com.

14             THE WITNESS:  Yes.  And you'll see on the third page

15  the times I took the trip, which was three hours in advance.

16             THE COURT:  Okay.  It sounds like something

17  conceivably could be going on between New York time and

18  California time.

19             THE WITNESS:  Yes.  And this is all related to the

20  merits.

21             THE COURT:  Yes.  Okay.  Let's hold on the merits

22  issues.

23             THE WITNESS:  Okay.

24             THE COURT:  Mr. Rosenstein, is there anything you want

25  to ask about any of those documents?

NM8DLeeH                          Lee - Cross

1              MR. ROSENSTEIN:  I just want to take a quick look at

2     this last one if I could.

3              THE COURT:  Yes.  Sure.

4              MR. ROSENSTEIN:  Thank you.

5              Nothing further.

6              THE COURT:  Okay.  You can step down, Ms. Lee.  Thank

7     you.

8              MS. LEE:  Thank you, your Honor.

9              These exhibits you gave me, I keep it?

10             THE COURT:  We keep it.

11             THE WITNESS:  Okay.  Because it's a lot.

12             THE COURT:  That's all right.

13             Mr. Rosenstein, I would like you to send in a list by

14    number of your exhibits, and it should identify what they are,

15    and ideally send in an electronic copy with the exhibits.

16    Okay?

17             MR. ROSENSTEIN:  Absolutely.

18             THE COURT:  Thank you.

19             All right.  So, Mr. Rosenstein, we had this hearing

20    based on Delta's application.  Is there anything else you want

21    to say now that you've taken testimony from Ms. Lee?

22             MR. ROSENSTEIN:  Our application, and it speaks for

23    itself, and the concerns that we have and have continued to

24    have in this case persist.  There is powerful circumstantial

25    evidence of Mr. Azzarmi's involvement in this case.  That

NM8DLeeH                    Lee - Cross

1    circumstantial evidence is evidence that can be considered by

2    the Court, but probative evidence is much more difficult to

3    locate, as we said in prior hearings.  The attempt to prove a

4    negative can be very difficult to do.  So we've given, I think,

5    the Court information, and really in furtherance of our duties

6    as officers of the Court, that's the reason that we have

7    presented information continually to this Court, because we

8    feel it is our responsibility to do so.

9        I think the Court has heard testimony and seen

10    documents, and there are additional documents that would

11    provide serious questions about the plausibility of some of the

12    testimony that was heard here today.  We're very much willing

13    to provide this Court with additional information based on what

14    we heard today at this hearing if the Court desires it.

15        This is a motion pending in California on the res

16    judicata issue that has been fully briefed, and it's on

17    submission out to the California Court.  That may result in

18    additional dispositive motion practice before this Court,

19    depending on the results of that decision and how quickly it

20    arises, but issues like this and like those raised I think are

21    serious in that they go to the heart of our jurisprudence

22    system.  And so we welcome the opportunity to provide

23    additional information if the Court desires it, and we're happy

24    to do so.  And the Court can make its own judgments as to how

25    to proceed with that full information.

NM8DLeeH                          Lee - Cross

1          THE COURT:  Ms. Lee, is there anything you want to

2     say?

3          MS. LEE:  Yes.  I would really like to get my -- I

4     would like to get to my case.  They're asking a lot of

5     questions about who wrote this or wrote that.  I wrote it.  I

6     came up here, and I believe that I gave to my best ability all

7     the information that you guys asked.  I wrote it.  I used

8     Google documents.  I even have consulted with attorneys in

9     regard to this.  So this is my information, and you definitely

10    can find all the information that I've gotten from YouTube

11    videos, Nolo Law, Cornell Law.  They have even how to win a

12    case with a 30(b)(6).  Like all of these -- all of these at

13    your fingertips.

14         And am I articulate to say everything like a lawyer?

15    Absolutely not.  But I did my research and I would just like my

16    day in court to show the merits of my case.

17         THE COURT:  Thank you.  I appreciate that.

18         I am still interested in what the California Court

19    will do.

20         MS. LEE:  Yes.

21         THE COURT:  So I'm keeping the stay in place for the

22    moment.

23         MS. LEE:  Okay.

24         THE COURT:  We'll see how much time passes there.

25         Certainly the Court has it concerns about the extent

NM8DLeeH                      Lee - Cross

1    of Mr. Azzarmi's involvement, if any, in this particular

2    lawsuit.  Obviously he was involved in service in some way at

3    the very least.  There certainly is circumstantial evidence

4    that much of what has been filed here bears resemblance in one

5    way or another to papers that he has filed, and there have been

6    issues about addresses and things of that nature that all raise

7    questions.

8         But certainly what I've heard today hasn't established

9    any proof that there was anything illegal or inappropriate

10   that's going on at the moment.  There may be, but so far the

11   Court doesn't have it in front of it.

12        Again, Ms. Lee has adopted and testified that all

13   these pleadings are her own and that Mr. Azzarmi was not

14   involved.  Again, maybe he was.  Maybe that will prove

15   untruthful.  I don't know.  But, again, before the Court I

16   don't have anything that would allow me at the moment on the

17   current record to find a particular impropriety.  But this will

18   be an issue probably that continues in the case, if the case

19   continues, and at some point it's possible that Mr. Azzarmi may

20   need to make an appearance in this case.  But, again, that may

21   depend on circumstances, and, as I think I mentioned last time,

22   there is nothing that prevents pro se plaintiffs from

23   coordinating with each other in different cases, particularly

24   where they were all former employees.

25        There may be issues about the merits of their cases,

NM8DLeeH                        Lee - Cross

1   but, again, I don't see that we have sort of a fraudulent or

2   token plaintiff of sorts that might appear in other cases.

3   Yes, it should not be the case that a ghost writer of sorts

4   creates all the legal pleadings that are submitted in a case,

5   and that might raise concerns, but, again, we don't have that

6   proof yet.

7              All right.  Let me ask, anything else, Mr. Rosenstein?

8              MR. ROSENSTEIN:  No, your Honor.

9              THE COURT:  Anything else, Ms. Lee?

10             MS. LEE:  No, your Honor.

11             THE COURT:  We were adjourned.  Thank you.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2   Examination of:                              Page

3   ERIKA LEE

4   Direct By Ms. Lee  . . . . . . . . . . . . . . 4

5   Cross By Mr. Rosenstein  . . . . . . . . . . . 7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300