**UNITED STATES U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ERIKA LEE, |
| *Plaintiff*, |
| v. |
| DELTA AIR LINES, INC., DAVID NEEDHAM & JOSE ROSADO, |
| *Defendants*. |

Civil Action No. 1:22-cv-8618-DEH-RWL

<u>**EXHIBIT A**</u>

<u>**TO**</u>

<u>**DELTA'S LETTER**</u>

<u>**DATED**</u>

<u>**May 6, 2025**</u>

```
 1

 2
                UNITED STATES DISTRICT COURT
 3
                SOUTHERN DISTRICT OF NEW YORK
 4

 5  ------------------------------------
    ERIKA LEE,                          CIVIL ACTION NO.:
 6                                       1:22-cv-8618-
                      Plaintiff,          DEH-RWL
 7
                  vs.                    Index No.
 8                                        22-cv-
    DELTA AIR LINES, INC, DAVID           08618
 9  NEEDHAM & JOSE ROSADO,

10                   Defendants.
    ------------------------------------
11

12

13

14            DEPOSITION OF ERIKA LEE

15              New York, New York

16            Tuesday, April 29, 2025

17

18

19

20

21  Reported by:
    Jeremy Frank, MPM
22  JOB NO. 1582745

23

24

25
```

ERIKA LEE
APRIL 29, 2025                    Part 1

JOB NO. 1582745

Page 18

1                    Lee
2  to?
3       **A. Excuse me?**
4       Q. Did you also review notes, you
5  said that you reviewed notes in
6  preparation for today's deposition,
7  were there any notes that you reviewed?
8       **A. Are you asking me did I review**
9  **notes or you're telling me did I review**
10 **notes?**
11      Q. You testified that you reviewed
12 notes.
13      **A. Yes.**
14      Q. What notes did you review?
15      **A. Objection, I reviewed the notes**
16 **that I took during the course of my**
17 **tenure at Delta Air Lines.**
18      Q. Do you have copies of those
19 notes?
20      **A. With me?  Are you asking me**
21 **that?**
22      Q. Do you have copies of those
23 notes with you today?
24      **A. Objection, I do not.**
25      Q. But you have copies of those

Page 19

1                    Lee
2  notes in your possession?
3       **A. Objection, I do.**
4       Q. Have you produced those notes to
5  Delta in connection with this litiga-
6  tion?
7       **A. Objection, they were not for**
8  **Delta's use.**
9       Q. Okay.
10                    RQ
11           Well, Miss Lee, we are going
12      to call for the production of
13      those notes which clearly should
14      have been produced before this
15      deposition both in response to
16      Delta's discovery requests and
17      orders from the court.  And we
18      are going to keep this deposition
19      open until we get copies of those
20      notes.
21      **A. Objection, you have those notes**
22 **already.  I have produced everything to**
23 **you, I also produced some notes and**
24 **e-mails between me and Danielle Kruit,**
25 **those were e-mails.  Also me and the**

Page 20

1                    Lee
2  **e-mails that I received from Jose**
3  **Rosado, he terminated me.**
4       Q. Apart from the e-mails between
5  you and Danielle Kruit and the e-mails
6  between you and Jose Rosado, did you
7  review any other e-mails in preparation
8  for today's deposition?
9       **A. Objection, I would have liked to**
10 **look at other e-mails but Delta Air**
11 **Lines never produced any or has given**
12 **me any.**
13      Q. Miss Lee, today is going to go a
14 lot faster if you just answer the
15 question that I'm asking you, I'll ask
16 again.
17           Apart from the e-mails between
18 you and Danielle Kruit, and you and
19 Jose Rosado, did you review any other
20 e-mails in preparation for today's
21 deposition?
22      **A. Objection, I reviewed every**
23 **e-mail that I had, and every e-mail**
24 **that I sent to you.  I would have liked**
25 **to have received more e-mails based**

Page 21

1                    Lee
2  **upon what Delta has in their possession**
3  **from when I worked there, but I never**
4  **received any of those.**
5           THE COURT REPORTER:  Clari-
6      fication, is it Daniel or
7      Danielle?
8           **THE WITNESS:  Danielle.**
9           THE COURT REPORTER:  Dani-
10     elle.
11          **THE WITNESS:  Pruitt.**
12          THE COURT REPORTER:  P-R-U-
13     I-T-T?
14          **THE WITNESS:  Kruit is**
15 **K-R-U-I-T.**
16          THE COURT REPORTER:  Give me
17     one second, counsel.
18 BY MR. FLEMING:
19     Q. Miss Lee, I want to make sure it
20 is clear for the record.  The notes
21 that you said you reviewed in connec-
22 tion with today's deposition you have
23 produced to Delta in this litigation?
24     **A. Objection, I produced all of my**
25 **evidence, all of my production**

ERIKA LEE                                                    JOB NO. 1582745
APRIL 29, 2025                          Part 1

Page 46

1                          Lee
2        Q. What race or races do you
3    identify as?
4        **A. I'm a Black American.**
5        Q. What gender do you identify as?
6        **A. I'm a female.**
7        Q. What is your sexual orientation?
8        **A. Heterosexual.**
9        Q. Have you ever filed for
10   bankruptcy?
11       **A. Objection, I'll put that as a**
12   **Fifth Amendment.**
13       Q. I'm sorry, what's the basis for
14   your Fifth Amendment objection?
15       **A. Financial.**
16       Q. The Fifth Amendment doesn't
17   protect against any financial disclo-
18   sures.
19       **A. If you choose to use it against**
20   **me later on as Sedgewick does.**
21       Q. Miss Lee, have you ever filed
22   for bankruptcy?
23       **A. Objection, I would like to**
24   **object to Fifth Amendment.**
25       Q. Fifth Amendment is not the

Page 47

1                          Lee
2    proper basis to object to this
3    question, you have to answer it.
4        Have you ever filed for
5    bankruptcy?
6        **A. I'm not going to answer it.**
7        **We can continue.**
8        Q. You're not going to answer that
9    question?
10       **A. No, I just told you, no.**
11       Q. Have you ever been convicted of
12   a felony?
13       **A. Objection, I have not.**
14       Q. Have you ever been arrested?
15       **A. Objection, I have not.**
16       Q. What is your current address?
17       **A. 20 Confucius Plaza, Apartment**
18   **10K, New York, New York 10002.**
19       Q. What kind of residence is that,
20   Miss Lee, is it an apartment or condo?
21       **A. This is an apartment.**
22       Q. How long have you lived there?
23       **A. Objection, about three years.**
24       Q. Does anyone else live in the
25   apartment with you?

Page 48

1                          Lee
2        **A. Objection, First Amendment**
3        **privilege, I won't be answering that.**
4        Q. Miss Lee, you don't have a First
5    Amendment right to not answer these
6    questions.
7        **A. I feel I do.**
8        Q. You have an obligation as a
9    litigant in this case to answer the
10   questions that Delta is asking, you do
11   not have a First Amendment right that
12   you can assert and not respond to these
13   questions.
14       Does anyone else live with you
15   at that address?
16       **A. Objection, First Amendment, I**
17   **won't be answering that.**
18       Q. Do you own the apartment?
19       **A. Objection, not necessarily.**
20       Q. What does that mean?
21       **A. Objection, it's a rental.**
22       Q. What's the monthly rent?
23       **A. Objection, I won't be giving you**
24   **how much I pay rent for, I put it as a**
25   **First Amendment.**

Page 49

1                          Lee
2        Q. Miss Lee, you do not have a
3    First Amendment right not to answer
4    questions in this deposition.
5        **A. Objection, let's not raise our**
6        **voices, sir. I said I won't be**
7        **answering it based upon my First**
8        **Amendment, and I'll give you my Fifth**
9        **Amendment as well.**
10       Q. No, neither of those apply in
11   this situation. You have an obligation
12   under the rules of the court to answer
13   the questions that you're going to be
14   asked in this deposition.
15       Are you telling me right now
16   you're not going to answer this
17   question?
18       **A. Objection, I'll put it as my**
19   **First Amendment and Fifth Amendment.**
20       Q. That's not responsive to the
21   question.
22       What is the rent for the
23   apartment that you live in?
24       **A. Objection, First Amendment and**
25   **Fifth Amendment, I'll not be answering**

**Page 50**

Lee

2 that question.
3     Q. We are going to raise that with
4 the magistrate judge as well; you
5 understand that?
6     A. Objection, you can raise it.
7     Q. Who pays the rent for the
8 apartment?
9     A. Objection, First Amendment and
10 Fifth Amendment, I will not be
11 answering that question either.
12     Q. What's the basis for your
13 purported First Amendment objection?
14     A. Objection, I don't have to
15 explain that to you.
16     Q. What's the basis for your
17 purported Fifth Amendment objection,
18 what legal jeopardy are you in in
19 answering that question?
20     A. Objection, I don't have to
21 answer that either, I don't have to
22 explain that to you.
23     Q. So it clear for the record, Miss
24 Lee, you're not to going answer my
25 question who pays the rent for the

**Page 51**

Lee

2 apartment?
3     A. Objection, I objected First
4 Amendment and Fifth Amendment in your
5 question about who pays my rent.
6     Q. So the answer is no, you're not
7 going to answer my question; is that
8 right?
9     A. Objection, I pose to you my
10 First Amendment and Fifth Amendment as
11 my answer for your question about who
12 pays my rent which will not be
13 answered.
14     Q. Miss Lee, are you married?
15     A. Objection, I'm not married.
16     Q. Have you ever been married?
17     A. Objection, I have never been
18 married.
19     Q. Do you have any children?
20     A. Objection, I have no children.
21     Q. Do you, is there any other
22 individual that you would consider a
23 significant other or domestic partner?
24     A. Objection, no.
25     Q. What is your highest level of

**Page 52**

Lee

2 education?
3     A. Objection, I guess bachelor's
4 degree, some postgraduate credits as
5 well.
6     Q. And where did you get your
7 bachelor's from?
8     A. Objection, New Jersey City
9 University.
10     Q. What's the degree in?
11     A. Business with a concentration in
12 marketing.
13     Q. When were you awarded that
14 degree?
15     A. Objection, 2003.
16     Q. What was the other education
17 that you said that you had beyond the
18 bachelor's?
19     A. I have a nursing license.
20     Q. Where is that license from?
21     A. State of California.
22     Q. Is it current?
23     A. Yes, it is.
24     Q. Did you attend a nursing school?
25     A. Yes, I did.

**Page 53**

Lee

2     Q. Where was that?
3     A. Lynnwood, California.
4     Q. What is the name of that school?
5     A. Lynnwood Adult School.
6     Q. When did you attend Lynnwood
7 Adult School?
8     A. Objection, let's say 2015 to
9 2016.
10     Q. Were you awarded any degrees
11 from Lynnwood Adult School?
12     A. Objection, yes, my nursing
13 certificate.
14     Q. Okay.
15     Do you hold any other licenses
16 or certificates?
17     A. Objection, no.
18     Q. Apart from New Jersey City
19 University and Lynnwood Adult School,
20 have you taken any other post high
21 school education classes?
22     A. Objection, yes.
23     Q. Where?
24     A. LA Trade Technical College.
25     Q. When did you attend LA Trade

Page 90

Lee

1
2   Sky Club, what does that mean?
3       A. During my time period in the Sky
4   Club I was working in the Sky Club and
5   that is when I met her.
6       Q. You met Myra while working at
7   Sky Club at JFK?
8       A. LAX.
9       Q. At LAX?
10      A. I never worked in the Sky Club
11  at JFK.
12      Q. Was this before or after your
13  Workers' Compensation leave?
14      A. Objection, before.
15      Q. How long before?
16      A. Objection, couple years.
17      Q. Then you testified earlier about
18  an incident involving Bernadette
19  Tamasi.
20          Do you recall that testimony?
21      A. Objection, I was talk about
22  Bernadette Tamasi spanking me, and then
23  I was telling you how Myra reported it
24  to Ashley Rangel, and how Ashley
25  Rangel, and how me reported to Ashley

Page 91

Lee

1
2   Rangel too, and she did not intervene
3   or --
4       Q. Miss Lee, I am just going to
5   stop you there, that's not what my
6   question is.
7       A. Just a moment I'm not done with
8   my question though. I'm not done with
9   my answer. And I reported it and so
10  did Myra, Ashley did nothing. And when
11  I came back to work, she then
12  retaliated me because I opposed the
13  race, sex discrimination, hostile work
14  environment in regards to Bernadette
15  Tamasi, Ashley Rangel retaliated
16  against me where she took away my
17  flight benefits, she even made travel.
18      I was stuck in Atlanta, Georgia,
19  she also told me I could not swap, I
20  could not bid, she made me take the
21  last line of the last person who was
22  hired for Delta although Delta's
23  business structure for airport
24  employees is based solely on seniority.
25  I was number one in my seniority at

Page 92

Lee

1
2   that time and I was forced to work the
3   last line of the last person who bid
4   it.
5       Q. Okay.
6       A. I told her, just a moment, I
7   told her this, and then we had several
8   forms of communication, several
9   communications through e-mail, where
10  I'm telling her that this is not in
11  line with Delta policy. I'm giving her
12  the policy, and I'm also showing her
13  where another man was able to come back
14  off the leave and bid appropriately in
15  his line, in his seniority, and she
16  goes no contact with me. I'm forced to
17  reach out to her manager, Melissa
18  Chapman.
19      Q. Miss Lee, just my question was
20  do you recall the testimony that you
21  gave prior to the break about Ms.
22  Tamasi? It is a yes or no question.
23      A. Well, I'm not going to say yes
24  or no. I'm going to tell you what I
25  said unless The Court Reporter wants to

Page 93

Lee

1
2   report it back to me so.
3       Q. Miss Lee, before the break you
4   testified about an incident with Ms.
5   Tamasi.
6           Did that incident occur at La
7   Guardia or JFK?
8       A. Objection, Ms. Tamasi,
9   Bernadette Tamasi spanked my behind at
10  La Guardia Sky Club. This was in 20,
11  I'm talking about the 2018 spanking.
12      Q. Why were you in the Sky Club at
13  La Guardia in 2018?
14      A. I was traveling out.
15      Q. Where were you traveling to?
16      A. At this moment I would like to
17  have my employee file and I can tell
18  you exactly where I was going, probably
19  LA, not LA, Atlanta, maybe Florida, but
20  since I don't have my travel records, I
21  don't know, I didn't make the flight
22  anyway, I went back home.
23      Q. Your testimony though is you had
24  a ticket to travel on this day?
25      A. Objection, I had a standby seat

Page 94

Lee

1
2  request.
3      Q. You were on Workers' Compensa-
4  tion leave?
5      A. Objection, I was out on leave
6  due to Workers' Compensation, I was
7  injured while I was working at Delta
8  Air Lines.
9      Q. A part from spanking you did Ms.
10 Tamasi do anything else during this
11 incident?
12     A. Objection, she didn't have time
13 to do anything else.  I turned around,
14 I told her, "Don't ever put your hands
15 on me."  Then I walked away from her.
16     Q. Did Ms. Tamasi say anything to
17 you during this incident?
18     A. No, she didn't say anything to
19 me at that moment, thank God, I was
20 trying to remain composed.
21     Q. Was Ms. Tamasi working at that
22 time?
23     A. Objection, she definitely was
24 working, she had on the uniform.
25     Q. How do you know it was Ms.

Page 95

Lee

1
2  Tamasi?
3      A. She had a nametag on.
4      Q. Did the nametag have her first
5  and last name?
6      A. It had her first name on.
7      Q. How did you find out what her
8  last name was?
9      A. Objection, the Delta directory.
10     Q. You looked her up in the Delta
11 directory?
12     A. Objection, yes, because I had to
13 report, I needed to know who I was
14 talking about.
15     Q. Then how did you report it?
16     A. I went, returned to Los Angeles
17 to start working, I reported it to
18 Ashley Rangel.
19     Q. Did you make an appointment to
20 see Ms. Rangel?
21     A. No, I walked into her office.
22     Q. Where is her office located?
23     A. At that moment, objection, her
24 office was on the third floor of
25 terminal two, I want to say.

Page 96

Lee

1
2      Q. At LAX?
3      A. At LAX.
4      Q. Were you still on leave at that
5  time?
6      A. Yes, I got, objection, yes, I
7  was still on leave.
8      Q. Okay.
9         After did you have any written
10 documentation of your meeting with Ms.
11 Rangel to report this incident?
12     A. Objection, you just took the
13 e-mails.
14     Q. There are e-mails between you
15 and Ms. Rangel that document the report
16 that you made to her about Ms. Tamasi?
17     A. Objection, no, there was, those
18 were on the ones that you just took
19 were about her retaliating against me.
20     Q. Do you have any written
21 documentation that you reported to Ms.
22 Rangel, the allegations that you made
23 against Ms. Tamasi?
24     A. Objection, no.
25         I do have a witness, Myra

Page 97

Lee

1
2  Amezquita, and I went up there two
3  separate times.
4      Q. You met with Ms. Rangel on two
5  separate occasions?
6      A. No, Myra went on one occasion
7  and I went on my own separate occasion.
8      Q. Do you know that Myra met with
9  Ms. Rangel?
10     A. Objection, Myra told me she met
11 with her, and when I went going to
12 report Bernadette Tamasi to Ms. Rangel,
13 she stated she had already heard Myra
14 Amezquita's side.
15     Q. You weren't present during the
16 meeting with between Myra and Ashley;
17 is that correct?
18     A. Objection, I was not.
19     Q. Apart from the one meeting you
20 had with Ashley Rangel, did you have
21 any other in-person meetings with her?
22     A. Yes, I did.
23     Q. Related to the allegations that
24 you made against Ms. Tamasi?
25     A. Objection, no.

Page 98

Lee

2  Q. What are the other meetings you
3  had with Ms. Rangel about?
4     A. So after I had returned back to
5  work, I already told you when I asked
6  for her help because I had a, there was
7  a position open at JFK.  And I told
8  her, I said, "Hey there is a position
9  open at JFK, I don't have anywhere to
10  stay here, how could I go over get over
11  there and then I wouldn't have to work
12  go back here anymore, come to LA
13  anymore."
14     She told me that she could not
15  help me for a reasonable accommodation
16  in the form of a transfer to JFK.  She
17  told me that I needed to return back to
18  work on active duty, and then I could
19  apply for any available positions.
20  Q. Was that the meeting --
21     A. Just a moment, I'm not finished.
22     After that, after she did that,
23  after she told me that, I came back to
24  work, I wasn't able to apply for any
25  available position.  She told me I

Page 99

Lee

2  could not, and I was not able to.  I
3  then came back to work.  And that's
4  when she told me that I could not swap,
5  I could not request days off, she told
6  me I was not able to bid for a day,
7  sorry, my line, a line of work.
8     She told me that she needed to,
9  I needed to take the last line of the
10  person just started even though I
11  number one in seniority, there were
12  available lines other than that one.
13  She stated, I told her this was unfair,
14  this was against company policy, and I
15  e-mailed Jojo Tumpap as
16  well as Wesley Porter with regard to
17  her not following corporate directives.
18  And at one point she stopped replying
19  to me, and I had went and e-mailed her
20  manager, Melissa Chapman, in regard to
21  my retaliation.
22     Absolutely nothing became of
23  that, she, they stood, they held,
24  doubled down and with Ashley's
25  retaliation toward me, and I was, I had

Page 100

Lee

2  to continue with that line.
3     And I told Ashley at that time I
4  met with her, again after I was there,
5  nothing was moving forward.  I told
6  Ashley, I told her, I said, "There is
7  an available position at the Delta Sky
8  Club in La Guardia.  I don't want to
9  take it, I don't want to apply, and are
10  you sure you can't do anything to get
11  me back to JFK?"  I said, "That's where
12  Bernadette Tamasi is."  Now she said,
13  "It is against company policy for me to
14  request any accommodation for you at
15  JFK, nothing is available."
16     She said if I was having
17  problems with finding somewhere to stay
18  in Los Angeles that I needed to take
19  any position available.  I figured I
20  would have gotten, I know I would have
21  gotten a position, and I applied but I
22  had nowhere to stay in LA.  I applied,
23  and when I applied, I was interviewed
24  by Randy and Sherrina, two other
25  managers there.  Bernadette Tamasi was

Page 101

Lee

2  not there, thank God.
3     Then of course I received a
4  position, but while I was there, there
5  was other positions, there was other
6  candidates.  There was a lady named
7  Kimberly N-G, Kimberly N-G was actively
8  on leave, she was applying for this
9  job.  And I had told her, I said.  She
10  worked in LAX Sky Club, "How do I not
11  know you," I had worked in LAX Sky
12  Club.  We were talking about the time
13  frame we were there and she was telling
14  me that we must have crossed paths.
15  Q. Miss Lee, I'm going to stop you
16  here because you're not answering the
17  question that I asked you.
18     A. First off, no.
19  Q. Miss Lee, you're not, and if you
20  don't answer the questions and prolong
21  things like this --
22     A. My question is not finished.
23  Q. -- then the deposition is not
24  going to be able to be completed today.
25     Do you understand that?

Page 102

1              Lee
2      A. We can complete today.
3      Q. I need you to answer the
4  questions that I'm asking you.
5      A. We can complete it today.
6      Q. I asked you about a meeting that
7  you had with Ashley Rangel and now
8  you're talking about a conversation --
9      A. We're coming back --
10         THE COURT REPORTER:  We are
11     going off the record if we can't
12     speak one at a time.
13     A. Let me finish.
14     Q. -- that you had with another
15  person.  Miss Lee, I need you to answer
16  these questions, okay, you're not
17  cooperating if you're not answering the
18  questions.
19         Do you understand that?
20     A. I'm coming back to that, let me
21  finish, let me finish.
22         THE COURT REPORTER:  You
23     have been going over 10 minutes,
24     let him ask a question.
25         MR. FLEMING:  Mr. Court

Page 103

1              Lee
2  Reporter, I'm going to ask you to
3  not give any commentary on the
4  record, please.
5      A. When I was speaking to Kimberly
6  Ng she told me she was actively out on
7  leave, right, she was working at LAX.
8  She told me that she caught Ashley
9  Rangel and Ashley facilitated her to
10  have an interview for the La Guardia
11  Sky Club.  She stated that she wanted
12  to come back to New York for family
13  reasons and that now she was in, she
14  was now in, she asked for Ashley for
15  any help that she could to actually
16  come back to New York.  She stated that
17  all of her items were still in LA on
18  the desk and that she never went back
19  to active duty at LAX.
20         I told her are you, I am talking
21  to her and I'm like trying to hold my
22  composure, and I'm trying, "So you, so
23  Ashley facilitated this interview?"
24  She said "Yes, I called her and I asked
25  her, and I told her I wanted to come

Page 104

1              Lee
2  back," and she helped her.
3         And after that, I was flabber-
4  gasted because I'm like, "Ashley told
5  me she couldn't help me but she helped
6  you."  And I finished speaking to her
7  as much as I could, I was extremely
8  distraught that I was inactive, she
9  said she couldn't help me, but this
10  inactive person she even facilitated
11  her.
12         I have actually more education
13  than Kimberly, and Kimberly Ng is not a
14  Black woman, let me put that out there,
15  she is a white woman.  And she would,
16  I'm just --
17     Q. Miss Lee, if you don't, you have
18  to answer the questions.
19     A. I'm --
20     Q. If you don't answer the
21  questions I'm going to have to call the
22  judge?
23     A. We can call the judge, we can
24  but I haven't finished.
25     Q. You haven't answered the

Page 105

1              Lee
2  question I asked you.
3      A. I haven't finished the question,
4  I haven't finished my answer.
5      Q. Please finish your answer then.
6      A. So, what was the question again?
7         MR. FLEMING:  Mr. Court
8     Reporter, can you please read
9     back the question.
10         (Whereupon the aforemen-
11     tioned testimony was read back by
12     the Court Reporter.)
13     A. I would just like everybody not
14  to speak a lot, not elevate your voice
15  please with me, I'm not doing that with
16  you.
17  BY MR. FLEMING:
18     Q. Miss Lee, if you don't answer
19  the question this deposition is not --
20     A. I am answering the question.
21         Yes, so that was the beginning
22  that when I was telling you about
23  Kimberly Ng I had asked, what is her
24  name, Ashley Rangel if she could help
25  me get back to New York.  So that was

ERIKA LEE
APRIL 29, 2025                                Part 1

JOB NO. 1582745

Page 106

Lee
1   one of the meetings and that's when I
2   was telling, that's why I was giving
3   you that whole lot, that whole answer
4   so you can understand.
5       And then after that another
6   meetings, the next meeting I had with
7   Ashley while I was back at work at JFK,
8   not JFK, LAX after my Workers' Comp
9   leave, I came back, I had asked Jojo
10  Tumpap, I had asked Jojo Tumpap you
11  know, I'm having a lot of issues here,
12  and I wanted to know what was Delta
13  looking for advancement, maybe I can
14  just move up in the company so I
15  wouldn't be subjected to these
16  arbitrary rules they are setting, and
17  they are not even real rules, not
18  following policy.
19      And when I asked him this, I
20  said what is Delta looking for?  I am
21  telling him my skills and I'm telling
22  him my education.  He goes, he starts
23  by telling me, "You need to lose
24  weight."  He said, I need to lose
25

Page 107

Lee
1   weight, I don't need to wear any
2   natural hairstyles, I need to wear my
3   hair straight.  He stated that I needed
4   to look sexy, wear a pushup bra or get
5   breast implants.  And then he told me
6   that I need to always wear the Delta
7   dress and wear heels.  He said, I don't
8   need to be acting like an aggressive
9   Black woman and make my voice sound
10  softer like a white woman.
11      So after he told me that I met
12  with Ashley Rangel and I told her what
13  he told me.  And she, that's when I
14  said listen, "I'm really tired of
15  what's going on here, I would really
16  like if you could see fit to help me
17  get out of this situation because he is
18  not, he should not be talking to me
19  like that, I should be sexy, I should
20  wear my natural hair, I should always
21  wear straight hair?"  And I told her,
22  "You know, that's sexual harassment."
23      And she's like, "That's not
24  sexual harassment, he didn't say that
25

Page 108

Lee
1   to you."  I said, "Yes, he did say that
2   to me."  And then she asked me if there
3   was any witnesses.  I said no, I pulled
4   him to the side to ask him about what I
5   could do to make myself more marketable
6   for a promotion.  And that was any
7   promotion even like say in-flight or
8   anything of that nature.
9       Q. When did that conversation with
10  Jojo Tumpap take place?
11      A. It took place, objection, it
12  took place at LAX on the floor, when he
13  was walking the floor.
14      Q. You were still assigned to LAX
15  at that time?
16      A. Yes.
17      Q. Were you still on your Workers'
18  Compensation leave at that time?
19      A. Objection, no, I was out on
20  active duty.
21      Q. Was it before you went out for
22  your Workers' Compensation leave?
23      A. No, objection, I was active
24  duty, this was the time period before
25

Page 109

Lee
1   after I came back from Workers'
2   Compensation before I left to go to La
3   Guardia Sky Club.
4       Q. After you had --
5       A. I am, now we talking about the
6   meeting with Ashley Rangel.  Then I was
7   talking to Ashley Rangel about him, she
8   was like, "You know, he didn't say that
9   to you, and I don't believe it."  Mind
10  you we already had a situation before,
11  I already spoke to her manager about
12  that situation where she retaliated
13  against me, and she still wasn't
14  listening to go me.
15      So I told her, "You know, if
16  you're not going to do anything, that's
17  not right, you're supposed to take my
18  statement and investigate it."
19      Q. Do you have any documentation of
20  that meeting with Ms. Rangel?
21      A. Objection, no.
22      Q. Where did that meeting take
23  place?
24      A. Oh, I went to her office.
25

ERIKA LEE
APRIL 29, 2025

Part 1

JOB NO. 1582745

**mischaracterization** 6:19,20,21

**misconduct** 61:13 62:4

**model** 124:24

**moment** 39:10 91:7 92:6 93:16 94:19 95:23 98:21 170:4 175:25 176:5 205:23 209:2 216:13 219:7 220:24

**Monday** 123:5 130:2 132:2

**money** 86:9 87:11

**month** 197:7

**monthly** 48:22

**months** 63:13,15 69:21 70:4 177:17 182:12

**mop** 124:5

**Morgan** 4:13 22:12 143:15

**morning** 4:3 5:23 13:20 35:11,24 36:19 129:24,25 131:24 133:24 205:7

**Mosaic** 58:14,15,19 59:5

**mother** 42:3,17 43:5 45:2

**mother's** 43:13

**mouth** 10:8,14

**move** 9:24 71:17 77:5 83:9 84:18 106:15 116:15 150:20 173:11 196:11 208:6

**moved** 66:2 85:25 202:10 203:25 217:17

**moving** 100:5 115:16 173:24

**Myra** 77:14,15,17,23 78:17 81:12 82:11,13,17 83:3 84:8 89:19 90:6,23 91:10 96:25 97:6,8,10,13, 16

**N**

**N-G** 101:7

**Nabors** 23:13,15,17 71:11 72:9 73:4,6,18,23 74:4 201:2 217:16

**Naheed** 189:3

**named** 101:6 176:9

**names** 45:18

**nametag** 95:3,4

**nappy** 126:15 193:21 208:20 213:6 215:12,17

**narrative** 6:18 153:7

**nation** 71:22 72:17 131:8

**natural** 107:3,21

**nature** 39:19 71:20 85:22 108:9 197:3

**necessarily** 48:19 57:17 190:16 199:24

**needed** 64:9 65:3 86:8 95:13 98:17 99:8,9 100:18 107:4 112:17 117:7,8 137:6 146:15 218:6 219:22

**Net** 132:8,22 134:3,4

**Newark** 65:10,14 66:23 67:5,8,13 68:15,17,22 69:14

**Ng** 103:6 104:13 105:23 110:13 111:7 112:5 113:2 114:23 115:11 116:21 117:12,14,21 118:3,10

**Ng's** 112:11

**Nichelle** 43:21,23

**night** 133:16

**nights** 133:16 207:18

**nipples** 193:13 211:11

**nod** 9:25

**nods** 9:23

**non-black** 72:12,21 117:13

**nonargumentative** 7:20

**noon** 143:14

**Notary** 5:18

**note** 14:11

**notebook** 156:9

**noted** 142:6

**notes** 17:11,16,23,24 18:4,5,7,9,10,12,14,15,19, 23 19:2,4,13,20,21,23 21:20 22:7,14,17,20 40:10, 13 156:10

**notified** 129:21

**November** 67:17,20 165:25 184:20

**number** 4:11 87:10,15 91:25 99:11 142:22 159:3 167:8 210:17

**numbers** 183:8

**nursing** 52:19,24 53:12

**NYU** 188:25

**O**

**oath** 12:17,20,21,24 13:2, 6 154:17

**objec-** 73:9

**object** 12:4 46:24 47:2

**objected** 8:5 14:8 51:3

**objecting** 6:12 58:24

**objection** 6:10 7:19 8:3, 9,21 9:13 10:6,25 11:10, 15,22 12:7,12,19 13:6,23 14:17,20 15:9,10,13,17,23 16:3,7,11,16,20 17:4,10,18 18:15,24 19:3,7,21 20:9,22 21:24 22:10,17,22 23:2,19, 24 24:11 26:16,25 27:9,18 28:2,10,17 29:9,21 30:15, 20 31:6,12,19 32:2,9,14, 17,22 33:2,9,14,20 34:2,6, 16,21 35:3,10,13,18,23 36:3,5,8,11,16,23 38:16,23 39:4,23 40:5,9,12,19,24 41:5,10,15 42:3,18,21 43:2,7,9,14,19 44:3,10,14, 19,24 45:4,9,15,19 46:11, 14,23 47:13,15,23 48:2,16, 19,21,23 49:5,18,24 50:6, 9,13,14,17,20 51:3,9,15, 17,20,24 52:3,8,15 53:8, 12,17,22 54:3,6,9,14,22 55:8,14,17 56:9,14,17

57:5,10,14 58:2,12,16,20, 22 59:2,15,24 60:3,8,15,25 61:9,14 62:5,8,14,19,24 63:12 64:2,21 65:6,19,22 66:2 67:3,9,14 68:4,7,18, 24 69:16,24 70:10,25 73:5, 13,17,20,24 74:10 75:2,15 76:2 78:10 80:20 82:4,23 83:14,21 84:6,15,24 86:20 88:4 89:6 90:14,16,21 93:8,25 94:5,12,23 95:9, 12,23 96:6,12,17,24 97:10, 18,25 108:12,20,24 109:22 110:5 111:10,19,22 112:7, 24 113:15,19 114:4 115:13 117:18,25 118:6,17 119:5, 9,17,19,23 120:7,13,17 121:6,18 122:4,11,16,20 123:3,13,22 124:14,18,22 125:4,12,19,23 128:5,10 129:4,10,16,18,21 130:17, 23,25 131:4,14 132:15 134:13,21 135:5,10 137:14,19 139:2,9 140:2,8, 15 141:5,10 154:22 155:4, 10,15 156:3 157:23 158:4, 13 159:5,10 160:12,18,22 166:8,22 167:14,18 168:2, 17,22 171:13 172:3,10 174:20,22 175:3,10 176:3, 12 177:10,23 178:16 179:2,9,14 181:2,10,16 182:2,6,13 183:12,16 184:7,19 185:6,17,22 186:2,11,21,25 187:8,16, 23 188:7,11,16,25 189:8, 20 190:2,8,25 191:3,8,13, 18,22 192:3,11,15,19 193:8 194:7,12,19,24,25 195:8,21 197:20 199:16 200:7,11 203:5,12 204:5 205:13,19,24 206:9,23 207:5,12 208:7,11,24 209:9,15,25 210:3,7,11,16, 23 211:6,15,16 212:2,8,14 213:9,13,16,23 214:12,16, 25 215:16 216:19 217:4 218:17,22 219:16,20 220:4,19 221:5 222:25 223:5,8,20 224:8,16 225:8, 14

**obligation** 48:8 49:11

**occasion** 97:6,7 199:8

**occasionally** 174:3

```
 1   UNITED STATES U.S. DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -------------------------------------------X
     ERIKA LEE,
 3
                          Plaintiff,
 4            -against-
                          CIVIL ACTION NO.:
 5                        #1:22-cv-8618-DEH-RWL

 6   DELTA AIR LINES, INC, DAVID NEEDHAM & JOSE ROSADO,

 7                    Defendants.
     -------------------------------------------X
 8
               Morgan Lewis & Bockius LLP
 9             101 Park Avenue
               New York, New York
10
               DATE: April 29, 2025
11             TIME: 3:31 P.M.

12

13   CONTINUED VIDEOTAPED DEPOSITION of ERIKA LEE, the

14   Plaintiff herein, taken by the Defendant, pursuant to

15   Article 31 of the Civil Practice Law & Rules of

16   Testimony, held at the above-mentioned time and place,

17   before GABRIELLA TUTINO, a Stenographic Reporter and

18   Notary Public of the State of New York.

19

20

21

22

23

24

25
```

ERIKA LEE
APRIL 29, 2025                                    Part 2

JOB NO. 1582745

Page 310

1    Q.  Do you have any receipts from the cab?
2    A.  Objection.  No.
3    Q.  Why were you in the Sky Lounge on this day?
4    A.  Objection.  I had access so I wanted to get
5  something to eat.
6    Q.  Did you know that Ms. Tomasi would be working?
7    A.  Objection.  No, I did not.  And there's three
8  lounges, I think two was open at that time.
9    Q.  You went to the lounge that Ms. Tomasi works
10 at?
11   A.  Objection.  I went to the closest lounge to my
12 gate, and unfortunately Tomasi was in that lounge.
13   Q.  Okay.  Do you have any other interaction with
14 Ms. Tomasi, did you report that incident to the police?
15   A.  Objection.  No.
16   Q.  Did you have any other interactions with Ms.
17 Tomasi while you were on COVID leave?
18   A.  Objection.  No, I did not thank God.  That was
19 my final interaction with her.  And I told you I was
20 scared to lose my job, I wasn't making any more reports
21 after Henrietta suspended me for two weeks.
22   Q.  How did you have access to the Sky Club?
23   A.  Objection.  I have an American Express
24 platinum card during that time period. I was still
25 employed.

Page 311

1    Q.  You were, excuse me?
2    A.  I was still employed and I had an American
3  Express platinum card.
4    Q.  So which, did you get access because you had
5  an AmEx card or because you were still employed?
6    A.  I had gained access because I had American
7  Express platinum card.
8    Q.  Did you make my purchases at the airport that
9  day?
10   A.  Objection, no.  I had access to the lounge so
11 everything in the lounge is complimentary.
12   Q.  Do you have any written record that you were
13 at the airport on that day?
14   A.  Objection.  No.
15   Q.  Have you --
16   A.  There's been plenty of flights I haven't made
17 during my tenure there.
18   Q.  Okay.  Are there any other incidents between
19 when you went out or when you returned from your
20 suspension and when you went out on COVID leave that
21 you're claiming were retaliatory?
22   A.  Objection.  Yes.
23   Q.  What?
24   A.  Well, in February of 2021 I received a phone
25 call from David Needham.

Page 312

1    Q.  That's, I'm asking you about between when you
2  came back from suspension in April 2019 and when you
3  went out on COVID leave in March 2020?
4    A.  Objection.  No, I thought you meant during
5  COVID.  I was away from all the abuse at that point.
6    Q.  So the next incident that's related to your
7  claim is the communications with David Needham; is that
8  correct?
9    A.  After Bernadette Tomasi, objection.  After
10 Bernadette Tomasi slapped me a couple months into COVID
11 then I went, then after that the next interaction was
12 with David Needham.
13   Q.  Who is David Needham?
14   A.  Objection.  David Needham said that he worked
15 in HR at Delta JFK.  That was now my station.
16   Q.  Right, okay.  Prior to that time had you ever
17 communicated with David Needham before?
18   A.  Objection.  I never met him physically. I've
19 only spoken to him on the phone.
20   Q.  When did you speak to David Needham on the
21 phone?
22   A.  David Needham called me and left a message on
23 my phone.  He stated that he had wanted to speak to me,
24 something in regard to Bernadette Tomasi spanking me.  I
25 called him back a couple days later as I was traveling

Page 313

1  out and I called him back from the station phone.
2    Q.  Just before, he called you on what phone?
3    A.  He called me and left a message on my cell
4  phone, that's our home phones now right.
5    Q.  Do you still have that message?
6    A.  I may possibly have it.  Objection. I might or
7  might not.
8        MR. FLEMING: That message has not been
9  produced to Delta.  So I'm going to call for its
10 production.
11       THE WITNESS: If I have it you'll get it.
12   Q.  Have you looked for the message?
13   A.  Objection.  Well, you know I've changed phones
14 since then so I have to look for it.
15   Q.  When did you change phones?
16   A.  I changed phones from 2019.
17   Q.  I thought this phone call was in --
18   A.  2021.
19   Q.  February 2021?
20   A.  Objection.  Since 2021 to now we are in 2025,
21 I have changed phones.
22   Q.  Every time that you've changed phones, have
23 you taken any steps to make sure the information is on
24 those phones is retained?
25   A.  Objection.  I do try to maintain.

ERIKA LEE
APRIL 29, 2025                          Part 2                          JOB NO. 1582745

Page 314

1    Q.   What steps have you taken?
2    A.   Well, objection.  I try to back it up.
3    Q.   How did you try to did that?
4    A.   Objection. You can back it up through Google.
5    Q.   Did you do that?
6    A.   Or maybe through a streaming device like maybe
7  Apple Music.
8    Q.   How did you back up your phone, that's what
9  I'm asking you?
10   A.   Objection.  When you transfer things over, you
11  can put the phone together and it transfers over.
12   Q.   Ms. Tomasi I'm asking what specifically you
13  did, I'm sorry. Ms. Lee, what did you do?
14   A.   What did I do, I put the phones together and
15  so the, so it could come off one phone to the next, to
16  transfer it from one phone to the next.  You just put
17  them together and it syncs.
18   Q.   Is all the data that you had on your phone in
19  February 2021 on your current phone?
20   A.   Objection.  Maybe or maybe not, I don't know.
21   Q.   Have you checked?
22   A.   Objection.  I have not checked.
23        MR. FLEMING: I'm just going to remind you
24  that you have an obligation to preserve all records in
25  your possession, custody, or control related to this

Page 315

1  case
2        THE WITNESS: Objection.
3        MR. FLEMING: You should have already been
4  aware of that but we're going to be calling for the
5  production of a number of documents after this
6  deposition.  And if any of them are altered in anyway
7  between now and then, we will certainly raise that with
8  the court, as well as any other relief that we may be
9  pursuing.
10        THE WITNESS: Objection.  I gave you
11  everything I had.  You're asking me for a phone call
12  message from 2021.  I have since changed.
13   Q.   You claim you never even looked for it?
14   A.   I have looked for it.  If I don't see it, I
15  have to move on.  How many documents do I need.  I have
16  all these documents.
17   Q.   So Mr. Needham left you a voicemail?
18   A.   Yes.
19   Q.   What did he say on the voicemail?
20   A.   Objection.  David Needham called me and left a
21  message on my phone which would be now my home phone
22  which is my cell phone. And he stated that he wanted to
23  talk to me about Bernadette Tomasi spanking me or
24  Bernadette Tomasi incident.  I can't quote you line for
25  line but it's the incident.  And then after that I was

Page 316

1  on COVID leave, right.  So I returned his phone call a
2  couple days later because it couldn't have been such
3  important, I haven't been in the work place.  When I got
4  to the airport, I picked up one of the phones at the
5  gate and gave him a call back.
6    Q.   Why were you at the airport?
7    A.   Objection.  I was traveling out.
8    Q.   Where were you traveling to?
9    A.   Objection.  Maybe LA, maybe Atlanta. I want to
10  say LA.
11   Q.   Why were you traveling to LA at that time?
12   A.   Objection.  To visit with my friends.
13   Q.   Okay.  Do you have any records of the trip
14  that you took to LA?
15   A.   Objection.  I do not.
16   Q.   Okay.  You called Mr. Needham back when you
17  were at the airport?
18   A.   Yes.
19   Q.   What airport was that?
20   A.   Objection. JFK.
21   Q.   What number did you call him at?
22   A.   Objection.  I left, I called him at the number
23  he left on my voicemail.
24   Q.   Did you write that number down somewhere so
25  you knew how to call him back?

Page 317

1    A.   Objection.  I believe when I got to the
2  airport, when I got to the phone I looked up under my
3  recent calls and saw, and used that number.
4    Q.   Okay?
5    A.   Because it was the same as the number he left
6  on my voicemail.
7    Q.   So you called him back?
8    A.   I called him back.
9    Q.   Do you have any records of that call?
10   A.   Objection.  I called him from Delta, Delta
11  would have the records.  I called him from a Delta
12  phone.
13   Q.   You called him back from a Delta phone?
14   A.   Yeah.  You asked me, I said I was in the
15  airport. I picked up one of the phones at the gate.
16   Q.   Why did you call him back from a Delta phone
17  and not the phone that he called you on?
18   A.   Objection.  Because that's my phone, that's my
19  private phone.  He's asking me about something obviously
20  dealing with work.  So I'm calling him from a work phone
21  number.
22   Q.   So is it your practice every time you had to
23  speak with anyone about anything having to do with your
24  job, you called them from a Delta phone in a Delta
25  airport?

ERIKA LEE
APRIL 29, 2025                                    Part 2

JOB NO. 1582745

Page 318

1    A.    Objection.  Please don't put words in my
2  mouth.  But what I'm saying is I was out on leave
3  because I hadn't  been in the workplace almost one year,
4  and he called me for some sort of incident.  And while I
5  was at work, I returned his phone call while I was at
6  JFK.
7    Q.    On your way?
8    A.    On my way out of town.
9    Q.    Did you speak with Mr. Needham?
10   A.    Objection. Yes, I did.
11   Q.    What did you say to him?
12   A.    Well I said, hello Mr. Needham, David this is
13 Erika.  You gave me a call, I'm returning it, what can I
14 do for you.
15   Q.    Did he respond?
16   A.    Absolutely.  Objection.  He stated that he
17 wanted to know any information about, he wanted to know
18 some information from me about some report that
19 Bernadette Tomasi had spanked me.  And then I stopped
20 him.  I said Bernadette may or may not have spanked me,
21 I'm not reporting it and I didn't report it because I'm
22 afraid of losing my job.  I said last time I reported
23 anything I was suspended for two weeks.  I told him
24 nothing needs to move forward, I'm very afraid, I'm at
25 this point in 2021 I'm 40 years old, it's very hard to

Page 319

1  get back into the work force and I'm almost tenured out
2  of Delta.  I'm going to a full time position and I
3  didn't want to --
4    Q.    I'm listening to you?
5    A.    Okay.  I didn't want to jeopardize that.  So I
6  stopped him and then he asked me, he was then, then he
7  said okay, but, listen, I see here that Bernadette
8  previously asked you if you like lesbian porn.  So now
9  he's asking me these questions that I told Henrietta
10 about.  And then he says, you know I could watch lesbian
11 porn with you if that turns you on.  And I was shocked,
12 I was like what are we doing.  After that he said I see
13 Bernadette asked if you had nappy pussy hair and you
14 said that, she said that she liked it shaved.  I told
15 him, I said what is going on here, he said well I like
16 hair, so I would like you to keep it long and nappy for
17 me if it's nappy.  He then stated, he's now talking very
18 sultry and everything and now I'm perplexed.  I'm like
19 wait a minute, wait a minute, where is this going, I
20 said I didn't want to make any reports, we don't need to
21 go and talk about anything that has happened in the
22 past.  You do not need to talk to me about anything, it
23 is now, he's now talking to me like he's trying to have
24 some type of phone sex.  And I'm telling him please
25 stop, I don't want to partake any of this phone sex, I

Page 320

1  said have a good day and I hung up the phone with him.
2    Q.    Okay.  Do you have any records of this call,
3  Ms. Lee?
4    A.    Objection.  Delta would have records of it.  I
5  used their phone.
6    Q.    Did you take any notes on the call?
7    A.    Objection.  I did not take any notes.  I
8  remember what he told me.
9    Q.    And did you tell anyone about the call after
10 it took place?
11   A.    Objection.  No.
12   Q.    At any time prior to today, have you reported
13 to anyone at Delta that Mr. Needham allegedly made these
14 comments while on the phone with you?
15   A.    Objection. Yes, I have.
16   Q.    When?
17   A.    March 25 I called Kelly Nabors and I told her
18 what happened.  I told her that he called me in
19 February, I called him back a couple days later, that he
20 tried to attempt to have phone sex with me and he called
21 me two more times after that.  I called her March 25
22 because he continued to call me after I told him to stop
23 calling me.  I told him I wasn't in the work place, I
24 didn't want to move forward with any type of
25 investigation on Bernadette Tomasi or any type of

Page 321

1  investigation on Bernadette Tomasi because I was in,
2  was afraid of losing my job, I was getting older, and I
3  wanted to keep my job and I love my job.  I was very
4  afraid after the last time of reporting any incident of
5  sex race discrimination or hostile work environment, I
6  was suspended for two weeks. So I told that to Kelly
7  Nabors and the last time I spoke to Kelly Nabors which
8  was in 2012 when I wanted to report to Alberto Cueva, I
9  never lost my job, I was never suspended.  So I thought
10 if I could tell her, she would not put my job in
11 jeopardy.  I just wanted him to stop calling me, that
12 person being David Needham because he had called me.
13   Q.    How many times did he call you?
14   A.    He called me and left a voicemail that was in
15 February.  Then he called me back -- then I called him
16 back, then he called me two more times after that.  So
17 three times, but two of the times I spoke and one of the
18 times I called and he spoke.
19   Q.    What number did he call you on?
20   A.    Objection. He called me on my cell phone.
21 That's the only number Delta has for me.
22   Q.    Do you have any records of those calls?
23   A.    Objection. No, I don't.
24   Q.    It's your testimony that you called Ms. Nabors
25 after those calls?

ERIKA LEE
APRIL 29, 2025                    Part 2

JOB NO. 1582745

Page 322

1    A.   Objection.  Yeah, after he called me two
2  additional times after I told him to stop, I called
3  Ms. Nabors March 25 to request that she tell him to stop
4  because I never met David Needham. Obviously I,
5  supposedly he worked that at Delta Airlines and he knew
6  about a previous incident between, previous sexual race
7  discrimination harassment that Bernadette Tomasi had
8  placed, that she was subjecting me to.  And after that,
9  you know, I was telling her, I was telling her that you
10  know I don't want to participate in a phone sex with
11  him.  I told him not to call me back anymore after that.
12    Q.   You called Ms. Nabors on March 25, 2021?
13    A.   Objection.  Yes, I did.
14    Q.   What phone did you call Ms. Nabors from?
15    A.   Objection, asked and answered. I told you I
16  called her from my cell phone.
17    Q.   What's your cell phone number?
18    A.   Objection. 646-552-8394.
19    Q.   That's the cell phone. How long have you had
20  that number for?
21    A.   Objection. I've had this number probably since
22  2011, 2012.
23         MR. FLEMING: We're going to call for the
24  production of all of your cell phone records for the
25  period of 2018 through the present.  If you don't have

Page 323

1  those records, then we're going to ask you to execute a
2  release so we can get them directly from your phone
3  provider. Otherwise we're going to subpoena them.
4         THE WITNESS: Objection.  I have changed
5  providers quite a number of time since then.
6    Q.   What cell phone providers have you had?
7    A.   I've had Straight Talk, I've had T Mobile,
8  I've had, I'm on other people's lines. I've been on
9  other people's line.
10    Q.   What does that mean?
11    A.   I have been on their family plan.
12    Q.   Who?
13    A.   Crystal Johnson, that's the one that comes up
14  right now.  Straight Talk, I use Straight Talk a lot.
15    Q.   What cell phone provider are you currently
16  using?
17    A.   I'm on T Mobile right now.  Objection.
18    Q.   What cell phone provider does Crystal Johnson
19  use?
20    A.   Objection.  She used T Mobile.
21    Q.   How long were you on Crystal Johnson's family
22  plan for?
23    A.   Objection. Possibly a year.
24    Q.   When was that?
25    A.   Good question.

Page 324

1         THE WITNESS: Court reporter, can you give me
2  some space.  I don't have those dates right now. So I
3  can't give you info on that right now.
4  (INSERT):_____
5  __.
6    Q.   Is there a document that you could review that
7  would refresh your recollection about when you were on
8  her plan?
9    A.   Objection.  I could possibly ask her.  But
10  what document, I don't know what document.  No document.
11  Mostly I was on Straight Talk that was a prepaid plan,
12  you buy a card and you put it in your, you add the
13  numbers to your card.  To your phone, sorry.
14    Q.   How would you buy the card?
15    A.   Objection.  You could buy it online, or you
16  could buy it from Walmart.
17    Q.   How did you buy it?
18    A.   I bought it several ways, sir.  I bought it
19  online.  I'm telling you the ways I bought it.  You
20  asked me how I bought it, and I'm telling you, online or
21  at Walmart.
22    Q.   Okay.  When you bought it online, how did you
23  purchase it? Was it a specific website?
24    A.   Objection.  Yes, it's a specific, it's called
25  Straight Talk.  It's a website.

Page 325

1    Q.   How did you purchase the phone online?  Did
2  you use a credit card?
3    A.   Objection.  It's more of a data plan or data
4  and phone plan.  It's not a phone, your number is you
5  put in a phone.
6    Q.   How did you pay for it?
7    A.   Objection.  I would pay for it maybe calling
8  -- with gift cards, you pay for it cash at the Walmart
9  store.
10    Q.   How would you pay for it when you were buying
11  it online?
12    A.   Objection. Online I would use a credit card or
13  a gift card.
14    Q.   Both?
15    A.   Objection. Yes.
16         MR. FLEMING: We're also going to call for the
17  production of your credit card records to the extent
18  they show any of this information.
19         THE WITNESS: Objection.
20    Q.   Did you have any other conversations with
21  David Needham apart from what you already testified to?
22    A.   Objection. No, I have not because he was the
23  only, I never met him in person.  He only called me
24  after I called him to return the call tat he left on my
25  phone.

ERIKA LEE
APRIL 29, 2025                                            JOB NO. 1582745
                          Part 2

Page 326

1    Q.   Okay.  Then you called Kelly Nabors on March
2    25; is that correct?
3    A.   Absolutely.  I called her and I told her what
4    he was doing to me, he was trying to have phone sex with
5    me, and I told her, I said can you please make him stop.
6    After that, that was the March 25.  March 26 I received
7    an e-mail on, from Danielle Kruit suspending me for
8    being dishonest.  That was pretextual because I had
9    nothing to be dishonest about it.  After that Danielle
10   Kruit along with Kelly Nabors made me do a conference
11   call with them on April 1.  April 1, I opposed sex race
12   discrimination and sexual harassment to Kelly Nabors as
13   well as Danielle Kruit in regards to David Needham, as
14   well as Bernadette Tomasi.  I was not filing any formal,
15   any formal complaints against Bernadette Tomasi, but I
16   wanted it to be known that I opposed it and I didn't
17   want to have anything to do with it.  Since now I
18   suffered sexual harassment, race discrimination, and
19   assault and workplace hostility from them for this long,
20   only because I wanted to keep my job and I was afraid
21   and now I'm suspended again, I was extremely upset.  And
22   I told, I told Danielle Kruit, I told Danielle Kruit
23   that I only endured this job because I wanted to keep my
24   job and now I'm suspended again.  I told her I opposed
25   sex race discrimination hostile work environment from

Page 327

1    David Needham and that's why I was reporting it to Kelly
2    Nabors.  I didn't want a formal investigation on him, I
3    just wanted her to tell him to stop.  And I was met with
4    a suspension from Danielle Needham, sorry Danielle
5    Kruit.  And after Danielle Kruit suspended me on the
6    26th of March 2021, she then took away all my flights
7    benefits March 26, 2021.  I spoke with here and Kelly as
8    I told you before, April 1, 2021.
9    Q.   You were told that your suspension was in
10   connection with an investigation into dishonest
11   behavior; is that correct?
12   A.   Objection.  That's what she wrote on that
13   suspension report, on that suspension letter.
14   Q.   When you spoke with Kelly Nabors on March 25,
15   2021, did Ms. Nabors raise with you the second amended
16   complaint that you filed in the California action?
17   A.   Objection. She did not.  She was asking me
18   about the phone calls from David Needham, as you are
19   asking about the phone calls.  She asked about his phone
20   call and did I return his phone call.  And I stated I
21   did and that's when he would try to perform sex talk
22   with me or phone sex with me and that's what I was
23   opposing when I spoke to her April 1, 2021.
24   Q.   April 21, 2021?
25   A.   April 1, 2021.

Page 328

1    Q.   I'm talking about the March 25, 2021 phone
2    call?
3    A.   March 25, 2021 I spoke to Kelly Nabors and I
4    reported, I told her about David Needham calling me,
5    having phone sex with me like, phone sex where he was
6    bringing up Bernadette Tomasi when I reported her to
7    Henrietta Archie.  And then he was saying that you know,
8    if I had nappy coochie hair and I see Bernadette likes
9    it shaved, I don't like it shaved, I like hair, you're
10   going to keep your hair for me, that's the phone, that's
11   the dialogue of our conversation.
12   Q.   It's your testimony here, under oath testimony
13   here that you told that to Kelly Nabors on March 25,
14   2021?
15   A.   March 25, 2021 I told that to Kelly Nabors.  I
16   reached out to her, I had spoken with her back in 2012
17   when I opposed sex race discrimination and hostile work
18   environment against Alberto Cueva.  She told me that she
19   wasn't going to file a formal complaint because Black
20   women are ultimately subjected to suspension and
21   termination.  That's why I reached out to her this time.
22   Q.   Ms. Lee, hang on, wait a minute.  I thought
23   you said that Ashley Rangel made that comment to you?
24   A.   Absolutely not.  She did, but the first person
25   that made it was Kelly Nabors when I reported sex

Page 329

1    discrimination and hostile work environment against
2    Alberto Cueva.
3    Q.   What race is Kelly Nabos?
4    A.   Objection.  She's white.
5    Q.   Have you ever met with her in person?
6    A.   Objection.  No.
7    Q.   How do you know that she's white?
8    A.   Objection, asked, answered.  You asked me this
9    already, I said from the internet.
10   Q.   From the internet?
11   A.   Google.  You put somebody's name in there and
12   pops up their picture.
13   Q.   When you spoke with Ms. Nabors on March 25,
14   2021 was she aware that Mr. Needham had called you?
15   A.   Objection.  She was unaware and I made her
16   aware, and I told her everything that had happened.
17   Q.   Then the next day you received the suspension
18   letter; is that correct?
19   A.   Yes, from Danielle Kruit.  After that, sorry
20   March 27, '21 Daniel Kruit took away my flight
21   privileges.
22   Q.   That's because you were suspended; correct?
23   A.   Yeah.  She, because she suspended me, she
24   started taking away my privileges.  And on the 25th, no
25   the 26 of April that's when she suspended me.  And she

ERIKA LEE
APRIL 29, 2025                                      Part 2

JOB NO. 1582745

Page 330

1  turned off, I couldn't get on the Deltanet anymore.  On
2  the 26th she took away my flight benefits and on the
3  suspension letter dated March 26, it's effective
4  immediately although I haven't been in the workplace
5  since March 30, 2020.  She suspended me while I was out
6  on leave.
7      Q.   You only received one suspension letter from
8  Danielle Kruit; correct?
9      A.   Objection.  No.  I received one in my e-mail
10  and one from UPS I believe.
11      Q.   Were they the same letter or were they
12  different?
13      A.   They might be different but they were
14  ultimately the same, dishonesty.
15          MR. FLEMING: Can we have this marked as
16  Exhibit L.
17          (Whereupon, suspension letter was marked as
18  Defendant's Exhibit L for Identification.)
19      Q.   Ms. Lee, before you look at that, why didn't
20  you include any of these claims regarding Mr. Needham's
21  alleged harassment in the complaint that you filed in
22  this action?
23      A.   Objection.  What do you mean.
24      Q.   Why didn't you include any of these
25  allegations about Mr. Needham sexually harassing you in

Page 331

1  the complaint that you filed in this action?
2      A.   Objection, calls for speculation.  I put
3  everything that was necessary when I filed for, when I
4  filed my record, when I filed my complaint in
5  California, I was told that I had too many pages.  So I
6  didn't want to put too much in my New York one, and it
7  not be taken into account and not be dismissed.
8      Q.   So the only reason that you didn't put it in
9  the complaint filed in New York is because of a page
10  limit?
11      A.   Objection. Yeah, and you know it was ongoing
12  as well.
13      Q.   You didn't identify as Mr. Needham as having
14  harassed you in any of the discovery responses that you
15  served on Delta in this action; correct?
16      A.   Objection.  I had nothing to, I had no
17  discovery on him.  I had no paperwork on him, it was
18  just conversation.  The, I mean, you always ask me is
19  there some type of written proof.  There was none, it
20  was just a conversation.  You have asked me about the
21  phone calls because Kelly, because I reported those
22  phone calls to Kelly Nabors.
23      Q.   At no time before today have you ever made
24  these allegations in any court document about Mr.
25  Needham allegedly sexually harassing you over the phone?

Page 332

1      A.   Objection.  I have talked about my years of
2  abuse at Delta Airlines.
3      Q.   I'm asking specifically about Mr. Needham.
4  You got to answer the question I'm asking you?
5      A.   Objection.  What was the question again.
6      Q.   At no time before today have you put in any
7  court document these allegations that you made against
8  Mr. Needham. Why is that?
9      A.   Objection.  How can I put anything, we are
10  dealing, objection.  I'm dealing with my termination,
11  hostile work environment, sex race discrimination and
12  harassment.  He abused, you asked me several times about
13  the phone call.  That's the only reason why I reached
14  out to Kelly Nabos is because of him and his phone call.
15  That's why you keep asking me about phone records
16  because of these phone calls.  It's in the documents.  I
17  can't give you a documentation on me and his phone calls
18  but you, Kelly Nabors is aware.  Delta is aware because
19  they keep asking about the phone calls and the phone
20  records.  They are aware. You're subpoenaing records, you
21  are aware of these conversations. Kelly Nabors was
22  initially notified, I put her on notice and then after
23  that I put Danielle Kruit on notice.  And I sent several
24  e-mails back and forth to Danielle Kruit about how she
25  is, how she is not, how she is treating me, how she is

Page 333

1  treating me differently, less favorably than my white
2  counterparts. I told her this.  There's e-mails on it,
3  back and forth e-mails.  I then --
4      Q.   Ms. Lee, are you alleging that you put in an
5  e-mail to Ms. Kruit these allegations you're making
6  against David Needham?
7      A.   Objection.  No.  At this point I was
8  suspended.  I'm not talking about what he said to me.
9  I'm telling her that I oppose what he told to me, and
10  she's aware of what he told to me because they keep
11  asking about the phone records.  I told her that when my
12  white counterparts oppose sex race discrimination, they
13  were never suspended or termination.  I gave her
14  examples. Then I'm the one, the Black woman was being
15  discriminated against, is now being the one suspended
16  and terminated ultimately moving forward.  And then I
17  told her this.  I told her all of this and I gave her
18  examples and then she suspend me again at the end of
19  April, which I have e-mails for too because I was called
20  back to work in late April, and I was called back to
21  work.  I was called, Shalonda Williams called me back to
22  work, she wanted me to come in and start all of my
23  administrative duties that would be starting
24  fingerprinting for my SITA badge and custom seal, and
25  stuff of that nature.

Page 350

1    A.   Objection.  I was sent an e-mail and then I
2  was also sent I believe it was, UPS.  I'll tell you for
3  sure.  Just a moment.
4    Q.   Ms. Lee, just so we are clear, the question is
5  how were you notified that you were terminated?
6    A.   Objection.  I was notified through e-mail and
7  I was also mailed it.  I want to make sure it was UPS or
8  USPS.
9    Q.   Did you speak with anyone about your
10 termination?
11   A.   Objection.  I told you that day that Jose
12 Rosado fired me, terminated my position at Delta.  I told
13 him I wanted to come back.  I told him about everything
14 that was going on, how I was being discriminated against
15 and retaliated against and even harassed by David
16 Needham.
17   Q.   Apart from Mr. Rosado, did you speak with
18 anyone else about your termination?
19   A.   Objection.  In what regard, you mean did I
20 tell my friends and family that you fired me.
21   Q.   Did you speak with anyone at Delta?
22   A.   Objection.  Not immediately but I have a lot
23 of friends at Delta.  They knew that, some know that I'm
24 fired, some don't.
25   Q.   I'm talking about at the time you were

Page 351

1  terminated, did you talk to anyone else at Delta?
2    A.   Objection.
3    Q.   You were informed that the basis of your
4  termination was that you lacked candor during the
5  investigation into the alleged conversation with David
6  Needham; correct?
7    A.   Objection.  That's what they stated but I told
8  them everything.
9    Q.   Do you know who else Delta spoke with in
10 connection with that investigation?
11   A.   Objection, calls for speculation.  I only know
12 what I did.
13   Q.   I'm just asking what you know.  Do you know if
14 Delta spoke with anyone else in connection with that
15 investigation?
16   A.   Objection.  I'm not aware.
17   Q.   Do you know if Delta collected any documents
18 in connection with that investigation?
19   A.   Objection.  I'm not aware.
20   Q.   Do you know anything about the investigation
21 that Delta conducted?
22   A.   Objection.  I'm not aware.  I believe I was
23 just being retaliated against.
24   Q.   Do you know who made the decision to terminate
25 you?

Page 352

1    A.   Objection.  Jose Rosado sent me the e-mail and
2  Danielle Kruit states that she finished the
3  investigation.  So, objection, it's between Jose Rosado
4  and Danielle Kruit.
5    Q.   And the basis for that belief is because they
6  sent you letters regarding the investigation?
7    A.   Actually it says that we investigated.  So it
8  would be two, more than one.  Based on information
9  you --
10   Q.   Beyond Danielle Kruit and Jose Rosado, you
11 mean?
12   A.   It says based on the information we have
13 collected, signed Jose Rosado.  So it would be up to
14 Jose Rosado and Danielle Kruit.  Danielle Kruit states
15 that she was in on the investigation and she sent me a
16 separate e-mail stating that investigation was closed.
17   Q.   Ms. Lee are you currently employed?
18   A.   Objection.  Fifth Amendment privilege.
19   Q.   Ms. Lee, you do not have a Fifth Amendment
20 privilege not to answer questions about your employment?
21   A.   Objection.  Fifth Amendment privilege, I will
22 not be answering.
23   Q.   What's the basis for your Fifth Amendment
24 privilege?
25   A.   The Fifth Amendment is so that it won't

Page 353

1  incriminate me and I will not be stating anything about
2  what I'm doing currently so that you can investigate and
3  probably try to ruin what I have going on for me right
4  now.
5    Q.   Is your employment right now in any way a
6  criminal endeavor?
7    A.   Objection.  I never stated that I was
8  employed.  I told you I was using my Fifth Amendment
9  privilege.
10   Q.   Is your search for employment in some way
11 criminal?
12   A.   Objection.  I told you I was never employed, I
13 told you I was waiving my Fifth Amendment privilege.
14   Q.   So you're not going to answer any questions
15 about your search for employment?
16   A.   Objection.  I will not be talking about my
17 employment or nonemployment.
18        MR. FLEMING: We are going to mark that for a
19 ruling by the judge.
20   Q.   You're going to have to come back and answer
21 these questions. I don't know why you won't just answer
22 them now?
23   A.   Objection.  Fifth Amendment privilege.  And
24 it's relevancy, it has nothing to do with anything.
25   Q.   It's plainly relevant?

Page 354

1   A.   How is it relevant.
2   Q.   It's relevant to what you've done to mitigate
3   your alleged damages?
4   A.   Well, I will tell you I'm disabled.
5   Q.   What does that mean?
6   A.   I'm unable to work
7   Q.   Are you receiving social security disability?
8   A.   Objection. No.
9   Q.   Are you receiving any kind of disability
10  insurance payment?
11  A.   Objection.  No.
12  Q.   Who made the determination that you were
13  disable?
14  A.   Objection.  My doctor.
15  Q.   Which doctor?
16  A.   I'm not, that's a doctor patient privilege.
17  Q.   That privilege does not exist in federal
18  court.  What is the name of the doctor that determined
19  you were disabled?
20  A.   You can ask that question and I will also
21  state that I will be not waiving my doctor patient
22  privilege and I will not be answering.
23  Q.   Okay.  When were you determined to be
24  disabled?
25  A.   Objection. Doctor patient privilege.

Page 355

1   Q.   What is the disability that you have?
2   A.   Objection.  HIPAA.
3   Q.   That's not a proper objection either.  What's
4   the nature of the disability that you have?
5   A.   Objection. HIPAA.
6   Q.   Will you answer any questions about the
7   disability that you claim to?
8   A.   Objection. I will not be answering anything
9   about my medical.
10  Q.   Are you claiming emotional distress damages in
11  connection with this action?
12  A.   Objection. Yes, I am.
13  Q.   Did you seek treatment from any doctors for
14  the alleged emotional distress?
15  A.   Objection. I am, I have.
16  Q.   Which doctors?
17  A.   I have seen Dr. Shah and I've seen Dr.
18  Michaels.
19  Q.   Any other doctor?
20  Q.   Objection. No.
21  Q.   Does your disability prevent you from working?
22  A.   Objection.  HIPAA.
23  Q.   Does your disability prevent you from working
24  you're claiming is a HIPAA issue?
25  A.   Objection. Yes.

Page 356

1   Q.   When is the last time you looked for work?
2   A.   Objection. Relevancy.
3   Q.   That's nota proper objection for a deposition.
4   You still have to answer the question?
5   A.   Objection.  I haven't been able to look for
6   work because I've been injured this entire time.
7   Q.   Have you provided Delta with any documents of
8   this alleged injury?
9   A.   Objection.  Why would I need to.  It's not
10  relevant to anything.
11  Q.   The injury that you have right now, you're
12  claiming is not relevant to any of the claims that
13  you're asserting in this action?
14  A.   It is not.  Objection. Jurisdiction.
15  Q.   Excuse me?
16  A.   Jurisdiction.
17  Q.   Jurisdiction, what does that mean?
18  A.   Worker's Comp.
19  Q.   Are you receiving Worker's Compensation
20  currently?
21  A.   No, it was an injury from Worker's Comp.
22  Q.   When did you receive a Worker's Comp, this is
23  in 2018?
24  A.   Objection. 2017.
25  Q.   And the injury that you had in 2017 has

Page 357

1   rendered you disabled; is that correct?
2   A.   Objection. I'm still awaiting treatment.
3   Q.   Awaiting treatment from who?
4   A.   Objection.  Physicians, doctor patient
5   privilege.
6   Q.   Ms. Lee, none of these objections are
7   prohibited or permitted rather in federal court.  So we
8   are going to have to call you back for another
9   deposition and we are going to make you pay for that
10  deposition.  Do you understand that?
11  A.   Objection.  That's up to the judge. And I'm
12  telling you I do not want, I'm not waiving my HIPAA.
13  Q.   You do not have any HIPAA rights with regard
14  to any of the things I'm asking?
15  A.   Please don't raise your voice.
16  Q.   I'm not raising my voice.
17  A.   You are.
18  Q.   You do not have, the HIPAA objection is not a
19  proper objection to assert here.  If you're not going to
20  provide this information to Delta now, we're going to
21  move to compel the court for you to respond to these
22  questions, we're going to seek all of our costs for
23  that.  Do you understand that?
24  A.   Objection.  Please do not threaten me.
25  Q.   I'm not threatening you?

Page 358

1    A.   You are threatening me. You threatened me in
2  an e-mail saying you were going to compel the court to
3  open my HIPAA.
4    Q.   Ms. Lee I'm not threatening you?
5    A.   You are threatening me.
6    Q.   I'm putting you on notice that Delta is going
7  to seek these records and we are going to seek costs
8  from you because you've wasted everyone's time here?
9    A.   Objection. I've not wasted anybody's time.
10 This, if the court decides to compel me to answer, this
11 can be written out. I do not have to be here for that.
12 I answered everything in relationship to my complaint.
13 You are now on some type of witch hunt and trying to
14 figure out what else you can find on me, just like when
15 you sent me that e-mail.
16   Q.   Ms. Lee, will you answer any questions today
17 that I'm asking you about your alleged disability?
18   A.   Objection. I will not answer any questions
19 relating to my medical.
20   Q.   Okay. So will you answer any questions
21 related to the emotional distress that you're claiming
22 you experienced?
23   A.   Objection. I can tell you that's in
24 relationship to this case, yes.
25   Q.   Have you sought medical treatment for that

Page 359

1  emotional distress?
2    A.   Objection. I have had medical treatment for
3  that.
4    Q.   Have you received any diagnoses in connection
5  for this alleged emotional distress?
6    A.   Objection. I have received a diagnosis. You
7  have that report from Dr. Shah as well as Dr. Michaels.
8    Q.   What records do you think that we have from
9  Dr. Michaels?
10   A.   I gave you HIPAA. I opened up a HIPAA for you
11 for Dr. Shah as well as Dr. Michaels. I sent that to
12 you.
13   Q.   Do you have any records in your possession
14 that are from either of these doctors?
15   A.   Objection. You did send me those, you have
16 them.
17   Q.   The records that we produced to you?
18   A.   Objection. You have sent me those, I believe.
19   Q.   Are those the only records that exist
20 regarding your alleged emotional distress?
21   A.   Objection. Yes.
22   Q.   Are you currently treating with any doctors
23 for your alleged emotional distress?
24   A.   Objection. It's a long wait. I don't have
25 any doctors right now. It's a very long wait, I don't

Page 360

1  have, you need good health insurance. If I did I
2  probably would have been seen by now. It's a very long
3  wait at the city hospitals.
4    Q.   What are the symptoms of the emotional
5  distress that you claim to have?
6    A.   I'm glad you asked. I suffer from
7  hypervigilance, I cry uncontrollably, insomnia, I'm
8  always tired, I can't get into a relationship, I can't
9  have sex with any man. I am always thinking about the
10 assault, I'm always suffering from guilty and shame. I
11 feel as though I've done something wrong when I've done
12 nothing wrong but exercise my rights. I curl up in a
13 ball, I am diagnosed with depression, I am diagnosed
14 with anxiety from Dr. Shah.
15   Q.   Who diagnosed you with --
16   A.   Dr. Shah and Dr. Michaels. I have also, my
17 friends and family notice I'm different. I don't take a
18 lot of care in my appearance or going out anymore. I
19 like to stay home because I don't have any energy or
20 want to leave my home due to my emotional distress.
21   Q.   When did this emotional distress start?
22   A.   My emotional distress started it began in
23 2012. It began in 2012 when Alberto Cueva, manager
24 Alberto Cueva began his sex race discrimination, hostile
25 work environment, discrimination and harassment.

Page 361

1    Q.   Has your emotional distress, the symptoms of
2  your emotional distress changed in any way since that
3  time?
4    A.   Objection. They have remained the same.
5  Looking forward to getting treatment, so.
6    Q.   You had all of these symptoms hypervigilance,
7  tiredness?
8    A.   Insomnia.
9    Q.   Inability to have sex, guilt, and shame in
10 2012?
11   A.   That would be, objection, that was the
12 beginning of it.
13   Q.   But you had all of those symptoms in 2012; is
14 that correct?
15   A.   Objection. That's when they began in 2012.
16   Q.   Okay. They've persisted since that time?
17   A.   Objection. Yes, they have.
18   Q.   Are there any new symptoms that you've had
19 since that time?
20   A.   Objection. Those symptoms have been
21 consistent.
22        MR. FLEMING: I want to take a five minute
23 break to check my notes and then we probably have about
24 20 more minutes of questions.
25        THE VIDEOGRAPHER: The time is 6:43 p.m. We

ERIKA LEE
APRIL 29, 2025

JOB NO. 1582745

Part 2

Page 362

1  are off the record.
2                (Off the record.)
3           THE VIDEOGRAPHER: The time is 6:56 p.m.  We
4  are back on the record.
5       Q.  Ms. Lee did you communicate with anyone during
6  the break about the deposition?
7       **A.  Objection. No, I did not.**
8       Q.  Apart from what we already discussed today,
9  are there any other incidents that you're alleging are
10  related to your claims against Delta?
11      **A.  Objection.  I want to make sure I noted**
12 **everything.  When I reached out to Jose Rosado June 7,**
13 **2021 he terminated me along with Danielle Kruit.  I did**
14 **ask on the 8 June, 2021 for reasonable accommodation so**
15 **I could get back into the workplace and give her**
16 **examples of available positions.**
17      Q.  You were suspended at that time; correct?
18      **A.  Objection.  Yes, I was.  That's why I sent her**
19 **the e-mail so that she could facilitate that so I can**
20 **get back into the workplace.**
21      Q.  My question though Ms. Lee, is apart from what
22 we already talked about, these are all things we already
23 discussed, apart from those things is there anything
24 else you're claiming is related to your claims?
25      **A.  Objection.  I mean you cut me off a lot so I'm**

Page 363

1  not exactly sure what is and what isn't in my record.
2           THE WITNESS: Maybe the court reporter can
3  leave some space and I will add anything once I see the
4  --
5  (INSERT):_____
6  __.
7       Q.  I'm just asking you sitting here today if
8  there's anything else?
9       **A.  Objection.  We discussed, I answered your**
10 **questions.**
11      Q.  I want to make sure apart from everything we
12 discussed, is there anything else that you're claiming
13 is relate to your claims?
14      **A.  Objection.  I answered your questions and as**
15 **of right now once I see the transcript, preliminary,**
16 **make sure everything I said is in there, there should be**
17 **nothing else.**
18      Q.  Okay.  So Ms. Lee you were originally
19 scheduled to be deposed on April 4 in this action;
20 correct?
21      **A.  Objection. Yes, I was.**
22      Q.  You claim you had a doctor's appointment on
23 that date; is that right?
24      **A.  Objection.  I don't claim.  I did have a**
25 **doctor's appointment and I gave you a doctor's note.**

Page 364

1       Q.  Who was the doctor that you saw?
2       **A.  I saw a bariatric doctor. Objection.**
3       Q.  What was the doctor's name?
4       **A.  It's on the notice.**
5       Q.  It's on the what?
6       **A.  It's on the letter.  It says Dr. Ryan Engel.**
7       Q.  What do you see Dr. Engel for?
8       **A.  Objection.  HIPAA violation.  I had a doctor's**
9  **appointment.**
10      Q.  Ms. Lee, we have an order from the court that
11 we're allowed to ask you questions about this doctor's
12 appointment?
13      **A.  Objection.  You definitely are allowed to ask**
14 **me anything in regard to my doctor's appointment, but**
15 **you can't ask me what me and my doctor discussed on our**
16 **appointment.**
17      Q.  I'm not asking you that. I'm asking you what
18 you saw the doctor for?
19      **A.  Objection.**
20      Q.  What's the basis for your objection?
21      **A.  HIPAA.  I already told you, it's already**
22 **stated that I'm having surgery.**
23      Q.  What's the surgery for?
24      **A.  Objection.**
25      Q.  Did you have surgery on April 4?

Page 365

1       **A.  Objection.  I did not have surgery, it's for**
2  **down line surgery.**
3       Q.  Down line surgery, is that what you said?
4       **A.  Surgery moving forward.**
5       Q.  What is that surgery?
6       **A.  Objection.  HIPAA.**
7       Q.  When is that surgery scheduled for?
8       **A.  Objection.  HIPAA.**
9       Q.  When did you contact your doctor to make the
10 appointment on April 4?
11      **A.  Objection. I did not contact my doctor, my**
12 **doctor contacted me and gave me that appointment.**
13      Q.  When did your doctor contact you and give you
14 that appointment?
15      **A.  Objection.  I'm not sure, but it was last**
16 **minute and I took it because I need surgery.**
17          MR. FLEMING: I'm going to show you what's
18 going to marked as Exhibit O.
19          (Whereupon, e-mail was marked as Defendant's
20 Exhibit O for Identification.)
21      Q.  Ms. Lee, I'm showing you what's been marked as
22 Exhibit O.  This is a screenshot of an e-mail that you
23 sent to me; is that correct?
24      **A.  Objection.  I can't verify but it appears to**
25 **be.**

ERIKA LEE
APRIL 29, 2025              Part 2

JOB NO. 1582745

Page 366

1    Q.   Okay.  This is an e-mail that was sent to you
2 by whom?
3    A.   Objection.  It was sent to me by Bellevue
4 Hospital.
5    Q.   Okay.  When was it sent to you?
6    A.   It appears to be sent to me March 30, 2025 at
7 8:02 a.m.  This e-mail went to my spam folder.
8    Q.   So how did you receive it?
9    A.   Objection.  I look through my spam folders now
10 and then and that's when I saw it.
11    Q.   Had you seen a doctor at Bellevue Hospital
12 before?
13    A.   Objection.  HIPAA violation.
14    Q.   Ms. Lee that is not a proper objection.
15 There's no HIPAA implicated issue here.  You've been
16 ordered, the court gave us an order that we can ask you
17 about this --
18    A.   This appointment.
19    Q.   This appointment?
20    A.   You're asking me about previous or other
21 appointments.  This appointment I will answer.
22    Q.   When did you make this appointment?
23    A.   Objection, question asked, question answered.
24 I told you, you asked this question already.
25    Q.   Your testimony is that you did not make the

Page 367

1 appointment, the hospital made the appointment for you?
2    A.   Objection.  Is that what you just heard me
3 say.  I told you this was a last minute appointment for
4 surgery.
5    Q.   Had you seen this doctor before?
6    A.   Objection.  We're only speaking on this
7 appointment.
8    Q.   Have you ever --
9    A.   HIPAA.
10    Q.   Have you ever seen a doctor before this
11 appointment?
12    A.   Objection.  We're only speaking on this
13 appointment.
14    Q.   Have you ever seen the doctor before this
15 appointment?
16    A.   Objection, HIPAA violation.  I'm only talking
17 about this one.
18    Q.   How would the doctor's office know to reach
19 out to you if you had not seen the doctor before?
20    A.   Objection.  Referrals.
21    Q.   Who referred you to this doctor?
22    A.   Objection, HIPAA violation.  We're only
23 talking about this appointment.  You're badgering me.
24    Q.   I am definitely not badgering you?
25    A.   You definitely are, I'm telling you.

Page 368

1    Q.   When did you actually read this e-mail?
2    A.   I read it about on the 3rd, late night.
3    Q.   When you were checking your spam folder?
4    A.   Objection. Yes, I was.
5    Q.   Where is the full version of this e-mail.  You
6 only provided us with a screenshot?
7    A.   Objection.  That's all you need.
8    Q.   No, Ms. Lee, you were ordered to give us the
9 e-mail that you claim to have received from your doctor.
10 This is not the e-mail?
11    A.   This is the e-mail that I received.  There's
12 nothing else.  I had an appointment and the appointment
13 says 4/4/25.  I have a doctor's note stating I was there
14 4/4/25.  What else do you need to know.
15    Q.   What time was the appointment for?
16    A.   The time of the appointment, I arrived around
17 10 a.m.
18    Q.   How did you know to arrive at 10 a.m.?
19    A.   I was told in the rest of the e-mail.
20    Q.   So there's another part of this e-mail where
21 it says that you were told to arrive at 10 a.m.?
22    A.   Objection. No, it's not another part of this
23 e-mail.  I had to go and get other stuff done at that
24 doctor's office which is necessary for my surgery.
25    Q.   Who told you that you had to do that?

Page 369

1    A.   Objection.  It's a part of the consultation.
2    Q.   How were you told that you had to have other
3 stuff done on 4/4/25?  How were you told?
4    A.   In the prepare for your visit, you press the
5 button.  I am not giving you any information on my
6 health.
7    Q.   If you click this button here, does it link
8 you to another communication from your doctor?
9    A.   Objection, HIPAA. It does. You know it does.
10    Q.   I have no idea what it does or does not.  I
11 know that you've not produced any documents besides this
12 e-mail, this screenshot of an e-mail that you claim
13 establishes that you saw a doctor on this date.  It
14 doesn't say anything about the time on here, it doesn't
15 say anything about the reason for the visit.  It says
16 you have an upcoming appointment on 4/4/2025.  It
17 doesn't say that you have been scheduled for a new
18 appointment?
19    A.   Objection.  Why would it say that.  It's just
20 telling me of my upcoming appointment.
21    Q.   When was that appointment made?
22    A.   Objection.  I told you. Question asked,
23 question answered.
24    Q.   When was -- you have not answered the
25 question?

ERIKA LEE
APRIL 29, 2025                                Part 2                                JOB NO. 1582745

Page 370

1    A.    I have.  You asked me before.
2    Q.    What was your answer?
3    A.    No, no, no, that's not how it's done.
4    Q.    Yes it is, Ms. Lee?
5    A.    You're badgering me.  This is called badgering
6  and you're really upset.
7    Q.    You are not answering the question?
8    A.    I did answer.
9    Q.    You've been ordered by the court to answer
10 these questions?
11   A.    The judge --
12   Q.    When was this appointment made?
13   A.    It was made not too long before that.  It was
14 an emergency appointment, and they called me and asked
15 me if I was available and I.
16   Q.    Who called you?
17   A.    The doctor's office.
18   Q.    What phone did they call you on?
19   A.    My phone number.
20   Q.    The cell phone number that you gave to us
21 previously?
22   A.    Yes.
23   Q.    Do you have records of that call?
24   A.    Of course not.
25   Q.    You don't have any records of the telephone

Page 371

1  call?
2    A.    Objection.  No.
3    Q.    Did you delete the records that you have of
4  the telephone call.
5    A.    Objection.  How long should they last.
6    Q.    Did you delete the records of the telephone
7  call?
8    A.    Objection. No, I did not delete anything.  It
9  deletes on its own just like the spam does.  You know,
10 you're badgering me because you're upset.
11   Q.    No, no?
12   A.    You are upset.
13   Q.    I'm not badgering you nor am I upset?
14   A.    You are because you're not getting the answers
15 you want.
16   Q.    How, did you have a record on your phone of
17 this telephone call?
18   A.    Objection.  I may or may not have. I am not
19 sure.
20   Q.    Have you checked your phone for it?
21   A.    Objection.  I have not checked my phone for
22 it.
23   Q.    Do you have your phone with you now?
24   A.    Objection.  I do.
25   Q.    Can you check your phone now to see if you

Page 372

1  have a record of the telephone call that you're claiming
2  you received about this appointment?
3    A.    No, it doesn't go back that far.
4    Q.    What's the earliest phone record that you have
5  on your phone?
6    A.    30 days ago.  It's only 30 days.  I don't have
7  a lot of memory.  Listen you're asking me about the
8  doctor's appointment.  Let's stick to that.
9    Q.    I am asking you about the doctor's
10 appointment.  So your phone only retains records for 30
11 days; is that correct?
12   A.    Objection. Yes.
13   Q.    In the 30 days since you got that phone call,
14 did you do anything to retain the records of the call
15 that you claim you received?
16   A.    Objection. I gave you the records which would
17 be this e-mail and this doctor's note.
18   Q.    Apart from those two documents, do you have
19 any other records that you attended an appointment on
20 April 4, 2025?
21   A.    Objection.  It would all be under HIPAA. It
22 would be the actual appointment.
23   Q.    I'm only asking if you have the records?
24   A.    Objection.  I do not have any additional
25 records to give you.

Page 373

1    Q.    You don't have any records of any telephone
2  calls from your doctor about the appointment?
3    A.    Objection. No, I don't have any records.  I
4  told you this.  You want me to keep something that's not
5  there.
6    Q.    Ms. Lee, we were advised by the doctor's
7  office that you made the appointment on February 14,
8  2025.  Why would that be?
9    A.    I'm not sure exactly why that would be.  You
10 called my doctor's office and they gave you my
11 information.
12   Q.    We were provided with information from the
13 hospital that you made the appointment on February 14,
14 2025?
15   A.    I think that is a lie.  I think that is a lie
16 and if it was scheduled on February 14, that's a lie.
17   Q.    Okay.  Do you see any other doctors at Health
18 and Hospital at Bellevue?
19   A.    Objection.  I'm not giving you any information
20 about my medial.  HIPAA.
21   Q.    Ms. Lee, I don't think you're cooperating with
22 the court's order in this regard.  So this is another
23 reason, this is another reason we're going to keep this
24 deposition open and the fact that we are going to have
25 to depose you again and we are going to seek costs from

ERIKA LEE                                                                      JOB NO. 1582745
APRIL 29, 2025                          Part 2

Page 374

1  you?
2      A.   You're very upset.  You're very upset.
3      Q.   I'm not upset?
4      A.   You are upset.
5      Q.   I'm not upset at all?
6      A.   I've given you information about this
7  appointment and I'm talking about this appointment.
8  You're asking me about additional doctors at that
9  facility, you're asking me information about phone
10  records, when a doctor called me, we are not doing this.
11  It's HIPAA violations.  You can be upset that you want
12  to get all in my business and I'm not giving you that.
13  That's not necessary.  Let the doctor, let the judge
14  tell me I have to give it, I doubt he will.
15      Q.   Did you have a co-pay you had to make in
16  connection with this visit?
17      A.   Objection.  No.
18      Q.   Is the surgery that you have scheduled, is
19  there a date for it?
20      A.   Objection, HIPAA violation.  We are talking
21  about this appointment.  Nothing down the line.
22      Q.   Okay.  Did you have an EKG?
23      A.   Objection.
24      Q.   On April 4, 2025?
25      A.   Objection, HIPAA violation.

Page 375

1      Q.   I'm just asking if you had an EKG. It's not a
2  HIPAA violation?
3      A.   You're asking me about my procedures.  That is
4  my medical, it is a HIPAA violation.
5      Q.   It's not a HIPAA violation.  That's not a
6  proper objection for the deposition?
7      A.   Doctor patient privilege, is that a better
8  objection.
9      Q.   Are you going to answer my question?
10      A.   Objection.  I just told you.
11      Q.   Beyond objecting, are you going to provide any
12  answer to my question?
13      A.   Objection.  Doctor patient privilege and
14  HIPAA.
15      Q.   Neither of those things apply.  Is there any
16  other basis, any other reason why you're not going to
17  answer my question?
18      A.   Objection.  I'm not going to answer your
19  question because HIPAA and doctor patient privilege.
20          (Whereupon, photo was marked as Defendant's
21  Exhibit P for Identification.)
22      Q.   Ms. Lee, showing you a document that's been
23  marked as Exhibit P. It's a one page document that
24  contains six photographs of six women.  My question to
25  you is do you recognize any of the women on this

Page 376

1  document?
2      A.   Objection.  I do not.  I cannot place these
3  women.
4      Q.   Ms. Lee, there's a notebook that you have here
5  that you've been taking notes in during the course of
6  today; is that correct?
7      A.   Yes.
8      Q.   Those notes are related to the deposition?
9      A.   Yes, you want them.  It's only one page.
10      Q.   Are there other notes that are in that
11  notebook that are related to your case?
12      A.   No.
13      Q.   I would like a copy of that?
14      A.   You could have the whole thing.
15      Q.   I don't need to take the whole thing. We can
16  just make a copy of it. Are you representing to me
17  there's nothing else in that notebook that's related to
18  --
19      A.   No.
20      Q.   The notes on the first page that you have
21  there, are those related to the case at all?
22      A.   There's plenty of notes in here.  This is an
23  old nursing notebook.  You want to, it's all related to
24  nursing.
25      Q.   There are no other notes in there that are

Page 377

1  related to your case against Delta?
2      A.   No, I only wrote on this one page and I did --
3      Q.   Can we make a copy of the notebook to confirm
4  that?
5      A.   You want a copy of the entire notebook.
6      Q.   Yes?
7      A.   Yeah.  I'm going to get it back today, right.
8      Q.   Yeah?
9      A.   Okay, yeah. And this is the only thing I wrote
10  on it.
11          MR. FLEMING: So subject to all the reasons
12  why the deposition was left open, I'm done with the
13  questions for today.  We're going to request an
14  expedited copy of the transcript.
15          THE REPORTER: What day do you need it by.
16          MR. FLEMING: We can go off the record, we
17  don't have to have this conversation on the record. Ms.
18  Lee, we're leaving the deposition open for purposes that
19  I discussed during the deposition.
20          THE WITNESS: Objection.
21          (Moved to next page to include Jurat.)
22
23
24
25

ERIKA LEE
APRIL 29, 2025

Part 2

JOB NO. 1582745

22,25 258:16 363:25
368:13 372:17

**notebook** 376:4,11,17,
23 377:3,5

**noted** 258:18 362:11

**notes** 254:24 257:1 265:2
281:14,15 286:17 301:20
320:6,7 343:12 344:11
361:23 376:5,8,10,20,22,
25

**notice** 250:11 252:9
332:22,23 335:17 345:3
358:6 360:17 364:4

**notification** 251:12

**notified** 332:22 349:24
350:5,6

**number** 286:16 315:5
316:21,22,24 317:3,5,21
321:19,21 322:17,20,21
323:5 325:4 343:10
370:19,20

**numbers** 324:13

**nursing** 376:23,24

---

O

**Oakland** 340:15

**oath** 328:12

**objecting** 375:11

**objection** 236:7,10,13,
22 237:2,7,11,15,25 238:3,
8,12,15,17,22,24 239:3,6,
10,17 240:5,11,14,21
241:11,13,21 242:1,4,6,8,
11,18,21,23 243:2,13,18,
25 244:5,13,17,21 245:12,
24 246:8,13,19,24 247:4,8,
11,12,15,25 248:11,15,21
249:4,13 250:5,16,24
251:1,7 252:10 254:1,14,
17,21 255:2,7,10,25 256:7,
14,19 257:2,6,9,23 259:2,
7,14,24 260:5,18,20 261:8,
10,15,20,24 262:5,16,19,
24 263:3,15,20 264:1,4,7,
11,16,25 265:13,17,21,25
266:8,12,17,20,23 267:4,8,
11,13,18,24 268:13,17,23
269:3,5,8,12,15,19,23

270:3,14,21,24 271:23
272:6,24 273:2,15,18
274:14,21,23 275:1,4,7,14,
20 276:1,5,11,16,22,24
277:7,9,19,24 278:2,6,14,
17 279:5,7,10,17,23 280:1,
5,14,22 281:1,4,7,11,15,25
282:5,12 283:5,8,13 285:4,
6,9,21,24 286:9,12,23
287:1,3,8,12,15,19,22,25
288:4,12,16,21,24 289:1,3,
5,10,13 290:4,22 291:19,
21,23 292:3,6,22 293:4,10,
14 294:4,6,8,15,18,20,24
295:2,6,9,17,24 296:3,10,
13,15,19 297:5,19,24
298:19,24 299:3,21,24
300:21,24 301:10,12,18,22
302:2,17 304:9 305:5,9,18
306:1,8,14 307:5,10,12,18,
24 308:13,16 309:2,9,20,
25 310:2,4,7,11,15,18,23
311:10,14,22 312:4,9,14,
18 313:6,13,20,25 314:2,4,
10,20,22 315:2,10,20
316:7,9,12,15,20,22 317:1,
10,18 318:1,10,16 320:4,7,
11,15 321:20,23 322:1,13,
15,18,21 323:4,17,20,23
324:9,15,24 325:3,7,12,15,
19,22 327:12,17 329:4,6,8,
15 330:9,23 331:2,11,16
332:1,5,9,10 333:7 334:8,
20 335:2,4,6,19,21 336:8,
15,20 337:6,10,25 338:4,9,
12,17,23,25 339:8,14,17,
23 340:3,21,25 341:18,22
342:1,8,15 343:4,7,15,20
344:2,6,10,21 345:11,16
346:10,13,15,22 347:12,
20,24 348:17 349:17,22
350:1,6,11,19,22 351:2,7,
11,16,19,22 352:1,3,18,21
353:7,12,16,23 354:8,11,
14,25 355:2,3,5,8,12,15,
20,22,25 356:2,3,5,9,14,24
357:2,4,11,18,19,24 358:9,
18,23 359:2,6,15,18,21,24
361:4,11,15,17,20 362:7,
11,18,25 363:9,14,21,24
364:2,8,13,19,20,24 365:1,
6,8,11,15,24 366:3,9,13,
14,23 367:2,6,12,16,20,22
368:4,7,22 369:1,9,19,22
371:2,5,8,18,21,24 372:12,
16,21,24 373:3,19 374:17,

20,23,25 375:6,8,10,13,18
376:2 377:20

**objections** 357:6

**obligation** 302:15
314:24

**occasion** 295:11

**Occasionally** 277:7

**occur** 309:3,14

**occurred** 301:13 306:6,
8,11 309:4

**offer** 253:25

**offered** 345:24

**office** 239:18 256:21
257:8 292:15 367:18
368:24 370:17 373:7,10

**older** 321:2 345:23

**ongoing** 331:11

**online** 324:15,19,20,22
325:1,11,12

**open** 280:17 310:8 358:3
373:24 377:12,18

**opened** 359:10

**operation** 246:2,3

**operational** 248:19,21

**opportunity** 253:1,9
280:17,24 283:22 292:11,
13,16,18

**oppose** 254:4 284:5
333:9,12

**opposed** 250:18 284:6
302:19 326:11,16,24
328:17

**opposing** 253:20 265:9
281:16 283:23 327:23

**option** 253:19

**oral** 298:13

**order** 276:25 364:10
366:16 373:22

**ordered** 366:16 368:8
370:9

**ordinary** 302:11

**original** 237:16

**originally** 363:18

**other's** 293:22

**overtalking** 258:2

**overtime** 248:16

---

P

**p.m.** 236:1 289:16,19
337:14,17 361:25 362:3
378:1,4

**package** 345:24

**pages** 331:5 335:13

**paid** 254:10

**Pam** 335:24 336:9,20
342:10

**pancakes** 303:1

**pants** 282:19

**Papadopulos** 268:18
273:23 274:17,20,24
282:5,18 300:2

**papers** 334:10

**paperwork** 331:17
342:4

**paragraph** 280:12,13
281:19,23,24 290:9,15
294:3 346:12

**paratransit** 245:7,11,
13,15 249:14

**part** 253:18 260:21
368:20,22 369:1

**partake** 319:25

**participate** 322:10

**parts** 294:22

**passing** 274:3,4

**past** 258:15 304:23
319:22

**patient** 354:16,21,25
357:4 375:7,13,19

**Patricia** 268:18,19 272:2
273:23 274:17

**pay** 251:25 253:14 254:8
281:18 325:6,7,8,10 357:9